UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRIAN T. EGGLESTON,

                 Petitioner,

     v.

MARGARET GILBERT,

                 Respondent.

CASE NO. 3:16-CV-05159-RBL-DWC

REPORT AND RECOMMENDATION

Noting Date: September 14, 2018

      The District Court has referred this action to United States Magistrate Judge David W. Christel. Petitioner Brian T. Eggleston filed his federal habeas Petition on February 29, 2016, pursuant to 28 U.S.C. § 2254, seeking relief from his state court convictions and sentence. *See* Dkt. 1. On March 16, 2016, Petitioner, through retained counsel Jeffery Erwin Ellis, filed an Amended Petition, which replaced the Petition. *See* Dkt. 6. After considering the record, the Court concludes Petitioner has voluntarily withdrawn Grounds 3 and 5. Petitioner failed to properly exhaust Ground 7 and, because Ground 7 was denied by the state court on an independent and adequate state procedural ground, the Court is barred from considering Ground 7. Further, the state court's adjudication of Grounds 1, 2, 4, and 6 was not contrary to, or an

unreasonable application of, clearly established federal law. Therefore, the Court recommends the Amended Petition be denied and a certificate of appealability be denied.

<u>BACKGROUND</u>

**I.     Factual Background**

The Court of Appeals of the State of Washington ("state court of appeals") summarized the facts of Petitioner's case as follows:

> In August 1995, Pierce County Deputy Sheriff Ben Benson began investigating Eggleston's marijuana dealing based on information he received from Steve McQueen. McQueen said that Eggleston's brother was a deputy sheriff and was present during one buy at Eggleston's house. Benson confirmed that Deputy Sheriff Brent Eggleston shared his brother's address.
>
> Benson then arranged for McQueen to buy marijuana from Eggleston. In early October 1995, McQueen bought marijuana from Eggleston twice. On October 9, Benson obtained a warrant to search Eggleston's home. He decided to serve the warrant early on October 16, before Eggleston was fully awake and before children arrived at the elementary school across the street from the Eggleston residence.
>
> The entry team included Deputies John Bananola, Warren Dogeagle, Jeff Reigle, John Reding, Cynthia Fajardo, Martin Kapsh, and Bruce Larson. Benson was to provide perimeter surveillance. The team wore marked jackets that identified them as sheriff deputies. Bananola wore a reflective vest that had four inch letters stating "Sheriff" on the front and back. He also had long hair and facial hair because of his undercover work. Reding wore a vest with "Sheriff" on the front and back, a helmet with a face shield, and black pants. Dogeagle wore a hooded mask because he was working undercover on a case involving heroin dealers in the same neighborhood. He also wore a cap with a sheriff's insignia and a green raid jacket with "Sheriff" on the front and back. Fajardo wore a black uniform that said "Narcotics" and her name on the front, and Reigle wore a green raid jacket with "Sheriff" on the front and back.
>
> The deputies entered the unlocked back door of the residence using the knock and announce procedure. Reding went in first and saw Thomas Eggleston, Eggleston's father, on the couch in the living room. Bananola followed and turned down a hallway. As Reigle prepared to follow Bananola, gunfire erupted. Reigle saw Bananola heading toward the front door of the residence in a low position. Reigle then saw Linda Eggleston open a door into the kitchen and look at him. He heard Thomas Eggleston tell her to put the gun down.

While covering Thomas Eggleston in the living room, Reding heard the shots and turned to see Bananola coming from the hallway in an upright position and then start to stumble. Reding retreated toward the back door and saw Eggleston move toward the living room with a gun in his hands. Reding fired three shots at him.

As the deputies withdrew, Dogeagle heard Bananola say, "Put the gun down. Police." Report of Proceedings (RP) at 4419–21. Dogeagle was still in the kitchen when Eggleston came through a door and started shooting at him. Dogeagle returned fire and Eggleston fell backward.

Reding returned to the van to retrieve a ballistic shield and entered the house with the other deputies behind him. They saw Bananola lying face down on the living room floor. He had been shot seven times, with three shots to the head and shots to the shoulder, arm, chest, and foot. Eggleston suffered five gunshot wounds, including wounds to his chest, lower right side, abdomen, groin and knee. Eggleston recovered; Bananola died.

In addition to evidence of the shootings, Tacoma police officers found drugs, drug paraphernalia and cash in Eggleston's bedroom.

The State charged Eggleston by amended information with aggravated murder in the first degree, alleging that he knew or should have known that Bananola was a law enforcement officer performing his duties at the time of his death; assault in the first degree based on his shooting at Dogeagle and/or Reding; unlawful delivery of a controlled substance (marijuana) on October 7, 1995; unlawful possession of a controlled substance with intent to deliver (marijuana) on October 16, 1995; unlawful delivery of a controlled substance (marijuana) on October 5, 1995; and unlawful possession of a controlled substance (mescaline) on October 16, 1995. Several of these counts included sentence enhancements.

These charges resulted in three trials. The first jury returned guilty verdicts on all counts except count I, murder in the first degree. The jury hung on the murder count and the court declared a mistrial. The trial judge sentenced Eggleston on the five counts for which he had been convicted.

The State tried Eggleston again on the first degree murder charge, and the jury found him guilty of the lesser included offense of murder in the second degree. The court had explicitly instructed that if the jury found Eggleston guilty of murder in the first degree, it was to fill out two special verdict forms: one on the aggravating factor (whether he knew or reasonably should have known that Bananola was an officer), and another on the weapons enhancement (whether he used a deadly weapon). In contrast, if the jury found Eggleston guilty of murder in the second degree, it was to fill out only the weapons enhancement special verdict form. Despite its acquittal of the first degree murder charge, the jury answered "no" to the aggravating circumstance special verdict. Clerk's Papers (CP) at 1495.

. . .

On appeal, we reversed Eggleston's murder and assault convictions but affirmed his drug convictions. *State v. Eggleston,* No. 22085–7–II, No. 23499–8–II, 108 Wash. App. 1011, 2001 WL 1077846 (Wash. Ct. App. Sept. 4, 2001) (unpublished). We found error in the aggressor and provocation instructions; we also found juror misconduct in the second trial and error in certain evidentiary rulings.

At Eggleston's third trial, the State's reconstruction expert, Rod Englert, opined that Eggleston fired into Bananola's head as Bananola lay on the living room floor. The defense reconstruction expert, Kay Sweeney, opined that Eggleston was in the hallway when he fired at and killed Bananola. In December 2002, the jury again convicted Eggleston of second degree murder and first degree assault.

Dkt. 27, Ex. 4, pp. 1-5; *State v. Eggleston*, 129 Wash. App. 418, 422–25 (2005), *as amended* (Sept. 30, 2005).

## II.    Procedural Background

### A.    Direct Appeal

Petitioner challenged his Pierce County Superior Court convictions and sentence arising from his third trial on direct appeal, raising twelve grounds for relief.[1] *See* Dkt. 27, Ex. 5. The state court of appeals affirmed Petitioner's convictions and sentence on the assault conviction, but vacated the murder sentence and reinstated the original sentence on the drug convictions. *Id.* at Ex. 4. Petitioner sought review by the Washington State Supreme Court ("state supreme court"). *See id.* at Ex. 8. The state supreme court granted review as to the exceptional sentence and double jeopardy claims. *See id.* at Ex. 11. On July 10, 2008, the state supreme court affirmed the state court of appeals. *Id.* at Exs. 16, 17.

---

[1] Respondent asserts that Plaintiff did not exhaust Grounds 3 and 7. Dkt. 25. Petitioner withdrew Ground 3 and Ground 7 is related only to the state court's decision regarding Petitioner's second personal restraint petition. *See* Dkt. 25, 35. Therefore, the Court will not discuss the specific grounds for relief raised on Petitioner's direct appeal or in his first personal restraint petition.

1    Petitioner was resentenced on October 24, 2008. Dkt. 27, Ex. 2. Petitioner appealed his

2    new sentence. *See id*. at Ex. 18. The state court of appeals affirmed the sentence on the murder

3    conviction, but directed the trial court to reinstate the sentence imposed in 2003 for the assault

4    conviction and to resentence Petitioner on the murder conviction in light of the reinstated assault

5    conviction sentence and Petitioner's 1997 drug conviction sentence. *Id*. at Ex. 24. Petitioner did

6    not seek review by the state supreme court. *See id*. at Ex. 25. The trial court again resentenced

7    Petitioner on August 13, 2010. *Id*. at Ex. 1. Petitioner did not appeal the sentence.

8    B.  Personal Restraint Petitions

9    Petitioner filed his first personal restraint petition ("PRP") seeking state post-conviction

10   relief on August 16, 2011. Dkt. 27, Ex. 26. Petitioner's first PRP was dismissed on the merits by

11   the state court of appeals. *See id*. Ex. 10.[2] Petitioner sought discretionary review from the state

12   supreme court, and, on March 2, 2016, the motion for discretionary review was denied with

13   comment. *Id*. at Exs. 37, 38. The state court of appeals issued a certificate of finality on April 14,

14   2016. *Id*. at Ex. 39.

15   On May 3, 2016, Petitioner filed a second PRP. Dkt. 27, Ex. 40.[3] This second PRP was

16   transferred to the state court of appeals. *Id*. at Ex. 45. The state court of appeals denied the

17   petition as untimely under Washington's time bar statute. *Id*. at Ex. 55. Petitioner sought

18   discretionary review from the state supreme court. *Id*. at Ex. 56.[4] On June 22, 2017, the state

19   supreme court denied the motion for discretionary review with comment. *Id*. at Ex. 57. Petitioner

20

21   _____

22   [2] The first PRP was mistakenly dismissed as untimely, but the state court of appeals corrected the error and reinstated the first PRP. *See* Dkt. 27, Exs. 31, 35.

23   [3] Petitioner raised the following ground for relief in his second PRP: The state failed to disclose material and exculpatory evidence related to Steve McQueen. Dkt. 27, Ex. 40.

24   [4] In the motion for discretionary review, Petitioner alleged: (1) Petitioner was denied due process and the state failed to disclose exculpatory evidence related to Steve McQueen; and (2) the state court of appeals erred. Dkt. 27, Ex. 56.

1    moved to modify the ruling denying review, which was denied without comment on October 4,

2    2017. *Id.* at Exs. 58, 59.

3        C.  Federal Petition

4        On March 16, 2016, Petitioner filed his Amended Petition raising the following seven

5    grounds:

6        1.  The trial court excluded videos made by the State of its own officers showing
           what occurred – evidence consistent with the defense theory; exclusion of this
7           exculpatory evidence violated the right to present a defense;
        2.  The trial court excluded other exculpatory evidence in violation of the right to
8           present a defense;
        3.  Petitioner was denied his constitutional right to effective assistance of counsel at
9           trial when counsel failed to challenge the reliability and admissibility of the
           State's reconstruction testimony;
10       4.  The trial court excused Deputy Garn from attending trial, and allowed the State to
           read his prior testimony, due to his alleged but unproven inability to testify
11          without becoming angry, violent, and unpredictable; this violated the federal
           confrontation clause;
12       5.  The State failed to disclose material and exculpatory evidence about two raid
           officers in violation of Petitioner's right to due process under the Fifth and
13          Fourteenth Amendments;
        6.  Petitioner was denied his constitutional right to a fair and impartial jury when a
14          juror was intimidated by a State's witness and where a juror was exposed to
           extraneous information about the case during the trial through a local newspaper;
15          and
        7.  The State failed to disclose material, exculpatory information about Steve
16          McQueen, a critical State's witness.

17   *See* Dkt. 6.

18       Respondent filed the Answer on January 3, 2018. In the Answer, Respondent maintains

19   Petitioner failed to exhaust Grounds 3 and 7, and these grounds are now barred from federal

20   review. *Id.* Respondent also argues the state court's adjudication of Grounds 1, 2, 4, 5, and 6 was

21   not contrary to, or an unreasonable application of, clearly established federal law. *Id.* After an

22   extension of time was granted, Petitioner filed his Response on March 12, 2018. Dkt. 35. On

23   April 10, 2018, the Court directed Respondent to provide videotapes not included in the state

24

court record. Dkt. 36. Respondent provided the videotapes on July 10, 2018 (Dkt. 41) and the Amended Petition became ready for review on July 20, 2018. *See* Dkt. 40.

DISCUSSION

**I.      Withdrawn Grounds**

In his Response, Petitioner voluntarily withdrew Grounds 3 and 5. Dkt. 35, pp. 15, 18. As Petitioner has withdrawn these grounds, the Court recommends Grounds 3 and 5 be dismissed.

**II.      Exhaustion and Procedural Default**

Respondent maintains Petitioner failed to exhaust Ground 7, and is procedurally barred from federal review of this ground. Dkt. 25. The Court agrees.

A.  Exhaustion of State Remedies

"[A] state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." *Picard v. Connor*, 404 U.S. 270, 275 (1971). Petitioner's claims will be considered exhausted only after "the state courts [have been afforded] a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary." *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986). "[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

A federal habeas petitioner must provide the state courts with a fair opportunity to correct alleged violations of federal rights. *Duncan v. Henry*, 513 U.S. 364, 365 (1995); *Middleton v. Cupp*, 768 F.2d 1083, 1086 (9th Cir. 1985) (petitioner "fairly presented" the claim to the state Supreme Court even though the state court did not reach the argument on the merits). It is not enough if all the facts necessary to support the federal claim were before the state courts or if a somewhat similar state law claim was made. *Duncan*, 513 U.S. at 365-66 (*citing Picard*, 404

U.S. at 275; *Anderson v. Harless*, 459 U.S. 4 (1982)). Petitioner must include reference to a specific federal constitutional guarantee, as well as a statement of the facts entitling Petitioner to relief. *Gray v. Netherland*, 518 U.S. 152, 162-163 (1996); *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005). Petitioner bears the burden of proving he has exhausted available state remedies, and retains the burden to prove all facts relevant to the exhaustion requirement. *See Rose v. Lundy*, 455 U.S. 509, 520 (1982); 28 U.S.C. § 2254(b)(1)(A).

In Ground 7, Petitioner alleges the State failed to disclose material, exculpatory information about Steve McQueen, a critical State's witness. Dkt. 6, pp. 31-32. In his second PRP, Petitioner raised this claim. Dkt. 27, Ex. 40. The state court of appeals denied the PRP because it was time barred. *Id*. at Ex. 55. Petitioner filed a motion for discretionary review with the state supreme court. *Id*. at Ex. 56. The state supreme court denied the motion for discretionary review, finding the state court of appeals properly dismissed the second PRP as untimely. *Id*. at Ex. 57.

Petitioner raised Ground 7 through the highest state court. However, because the state court denied Ground 7 because of an independent state rule, federal courts are procedurally barred from reviewing this claim.

B. Procedural Default

A petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman v. Thompson*, 501 U.S. 722, 729-35 (1991); *Murray v. Carrier*, 477 U.S. 478, 490-92 (1986). State courts may decline to review a claim based on a state procedural default. *See Wainwright v. Sykes*, 433 U.S. 72, 81-83 (1977). Federal courts hearing habeas petitions may not review state convictions, even for federal constitutional claims, if the state court's decision procedurally barring the petitioner's claims rests on an "independent and adequate" state law ground.

*Coleman*, 501 U.S. at 729; *Franklin v. Johnson*, 290 F.3d 1223, 1230-31 (9th Cir. 2002) (procedural default rule bars consideration of a federal claim when it is clear the state court has been presented with the federal claim but declined to reach the issue for procedural reasons). The resulting bar can be express or implied. A state court invokes an express procedural bar by explicitly referring to a state rule or procedure to deny a petitioner's claim, or by referring to a case or phrase that invokes the applicable rule. *See, e.g., Zichko v. Idaho,* 247 F.3d 1015, 1021 (9th Cir. 2001) (rule); *Park v. California,* 202 F.3d 1146, 1149 (9th Cir. 2000) (case). An implied procedural bar exists when a petitioner has failed to fairly present his claims to the highest state court and would now be barred from returning to do so by an adequate, independent, and mandatory state procedural rule. *Moreno v. Gonzalez,* 116 F.3d 409, 411 (9th Cir. 1997). Procedural default is an affirmative defense, and the state has the burden of showing that the default constitutes an adequate and independent ground. *Insyxiengmay*, 403 F.3d at 665–66.

Here, the state court expressly declined to consider Ground 7 because Petitioner's second PRP was time barred under a state statute. *See* Dkt. 27, Exs. 55, 57. The state court of appeals and state supreme court relied on Revised Code of Washington ("RCW") 10.73.090(1) to decline to reach the merits of the second PRP. *Id.* at Exs. 55, 57. RCW 10.73.090(1) provides that a petition for collateral attack on a judgment and sentence in a criminal case must be filed within one year after the judgment becomes final. Petitioner's judgment and sentence became final on August 13, 2010; therefore, the date to file a PRP expired on August 13, 2011. *See* Dkt. 27, Ex. 55; RCW 10.73.090. Petitioner did not file the second PRP until May 3, 2016. *See* Dkt. 27, Exs. 40, 55. Thus, the second PRP was filed approximately five years after the limitations period ran and the state court dismissed his second PRP as time-barred. *Id.* at Exs. 55, 57. As Petitioner's second PRP was denied based on a state procedural rule, the Court finds Ground 7 was denied by the state courts on an adequate and independent ground. *See Shumway v. Payne*, 223 F.3d 982,

988 n. 22 (9th Cir. 2000) (RCW 10.73.090 has been found by the Ninth Circuit to be an independent and adequate state law barring federal habeas review).

Petitioner contends the highest state court's "decision rested entirely on the conclusion that the suppressed evidence would not change the result of the trial," and thus did not deny Ground 7 for procedural reasons. Dkt. 35, pp. 22-24. The record shows the state court of appeals expressly denied Petitioner's second PRP –which raised Ground 7 – as time barred. Dkt. 27, Ex. 55. The state supreme court then found the state court of appeals properly dismissed Petitioner's second PRP as untimely. Dkt. 27, Ex. 57. The state supreme court analyzed the factors under the state statute that allowed for exceptions to the one-year statute of limitations on filing PRPs. *See id*. The factor examined by the state supreme court was whether the new evidence provided by Petitioner would change the outcome of the trial. *See id*. Petitioner appears to argue this factor is so interwoven with the merits of Ground 7 that the state supreme court decided Ground 7 on the merits. *See* Dkt. 35, pp. 23-24.

The state supreme court clearly and expressly denied the motion for discretionary review and affirmed the state court of appeal's decision because Petitioner had failed to timely file the second PRP. Dkt. 27, Ex. 57. Petitioner asserted new evidence overcame the procedural bar. As a result, the state supreme court analyzed this new evidence in light of the state statute which allows for exceptions to the one-year statute of limitations. *See id*. (citing to RCW 10.73.090 (limitation period) & RCW 10.73.100 (exceptions)). The state supreme court found Petitioner failed to show an exception to the one-year limitations period applied. *Id*. The state supreme court concluded the state court of appeals properly dismissed the second PRP as untimely. *Id*.

The Court notes the state supreme court did state that, "even if the time bar did not apply, [Petitioner] could not establish a *Brady* claim." *Id*. at p. 3. Regardless of this statement, the state supreme court expressly relied on a state statute to uphold the state court of appeals decision and

did not decide Petitioner's second PRP on the merits. *See id.* at Ex. 57. The Court finds the state courts clearly and expressly denied Petitioner's second PRP on an adequate and independent procedural ground. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) ("[A] state court need not fear reaching the merits of a federal claim in an alternate holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law."); *Bargas v. Burns*, 179 F.3d 1207, 1214 (9th Cir.1999) (finding "it is clear that the state procedural default rule is not interwoven with federal law" and finding that, when "the state trial court clearly set forth a state law ground on which petitioner's claim could be rejected, federal courts are precluded, under *Harris*, from reviewing that determination."); *Waldron-Ramsey v. Pacholke*, 556 F.3d 1008, 1012 (9th Cir. 2009) (finding the state court expressly found the PRP time-barred despite an "even if" argument finding the claim had no merit).

For the above stated reasons, the Court finds the state court expressly denied Petitioner's second PRP (which raised Ground 7) on an independent and adequate state procedural ground. Therefore, Ground 7 is procedurally defaulted in federal court.

The procedural default will be excused and a petitioner will be entitled to federal habeas corpus review if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice[.]" *See Boyd v. Thompson*, 147 F.3d 1124, 1126 (9th Cir. 1998) (*citing Coleman*, 501 U.S. at 750). To establish "cause," a petitioner must show some objective factor external to the defense prevented her from complying with the state's procedural rule. *Coleman*, 501 U.S. at 753 (*citing Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To show "prejudice," a petitioner "must shoulder the burden of showing, not merely that the errors at his

trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Only in an "extraordinary case" may the habeas court grant the writ without a showing of cause and prejudice to correct a "fundamental miscarriage of justice" where a constitutional violation has resulted in the conviction of a defendant who is actually innocent. *Murray,* 477 U.S. at 495–96. To demonstrate he suffered a fundamental miscarriage of justice, viewing all the evidence in light of new reliable evidence, the petitioner must show "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 547 U.S. 518, 537 (2006) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Here, Petitioner is silent regarding cause and prejudice to overcome the default. *See* Dkt. 6, 35. Petitioner fails to show some objective factor external to his defense prevented him from complying with the State's procedural bar rule. Petitioner also fails to show the alleged trial errors worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions, and thus has not shown prejudice. Furthermore, Petitioner has not provided new, reliable evidence showing he is actually innocent, and therefore this is not the kind of extraordinary instance where this Court should review the claim despite the absence of a showing of cause. Petitioner failed to show cause or prejudice to excuse his procedural default; therefore, the Court is barred from reviewing Ground 7 on the merits. Accordingly, the undersigned finds Petitioner is not entitled to relief as to Ground 7 and recommends Ground 7 be dismissed. *See Casey v. Moore*, 386 F.3d 896 (9th Cir. 2004).

1    **III.    Review of State Courts' Adjudication**

2        Respondent next maintains the state courts' adjudication of Grounds 1, 2, 4, and 6 was

3    not contrary to, or an unreasonable application of, clearly established federal law. Dkt. 25. The

4    Court agrees.

5        A.  <u>Standard of Review</u>

6        Pursuant to 28 U.S.C. § 2254(d)(1), a federal court may not grant habeas relief on the

7    basis of a claim adjudicated on the merits in state court unless the adjudication "resulted in a

8    decision that was contrary to, or involved an unreasonable application of, clearly established

9    Federal law, as determined by the Supreme Court of the United States." In interpreting this

10   portion of the federal habeas rules, the Supreme Court has ruled a state decision is "contrary to"

11   clearly established Supreme Court precedent if the state court either (1) arrives at a conclusion

12   opposite to that reached by the Supreme Court on a question of law, or (2) confronts facts

13   "materially indistinguishable" from relevant Supreme Court precedent and arrives at an opposite

14   result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

15       Moreover, under § 2254(d)(1), "a federal habeas court may not issue the writ simply

16   because that court concludes in its independent judgment that the relevant state-court decision

17   applied clearly established federal law erroneously or incorrectly. Rather, that application must

18   also be unreasonable." *Id*. at 411; *see Lockyer v. Andrade*, 538 U.S. 63, 69 (2003). An

19   unreasonable application of Supreme Court precedent occurs "if the state court identifies the

20   correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts

21   of the particular state prisoner's case." *Williams*, 529 U.S. at 407. In addition, a state court

22   decision involves an unreasonable application of Supreme Court precedent "'if the state court

23   either unreasonably extends a legal principle from [Supreme Court] precedent to a new context

24

1    where it should not apply or unreasonably refuses to extend that principle to a new context where

2    it should apply.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Williams*, 529

3    U.S. at 407).

4        The Anti-Terrorism Effective Death Penalty Act ("AEDPA") requires federal habeas

5    courts to presume the correctness of state courts' factual findings unless applicants rebut this

6    presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Further, review of

7    state court decisions under §2254(d)(1) is "limited to the record that was before the state court

8    that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).

9        B.   Right to Present Defense (Grounds 1, 2)

10       In Ground 1, Petitioner alleges his right to present a defense was violated when the trial

11   court excluded videos made by the State of its own officers showing what occurred during the

12   shooting. Dkt. 6, pp. 25-26. In Ground 2, Petitioner asserts his right to present a defense was

13   violated when the trial court excluded other exculpatory evidence. *Id*. at pp. 26-27.

14       The Constitution guarantees a criminal defendant a meaningful opportunity to present

15   relevant evidence in his own defense at trial. *See, e.g.*, *Taylor v. Illinois*, 484 U.S. 400, 408

16   (1988); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). "The Supreme Court has made clear that

17   the erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth

18   Amendment due process right to a fair trial and the Sixth Amendment right to present a defense."

19   *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001) (citations omitted). However, "the

20   right to present relevant testimony is not without limitation. The right 'may, in appropriate cases,

21   bow to accommodate other legitimate interests in the criminal trial process.'" *Rock v. Arkansas,*

22   483 U.S. 44, 55 (1987) (quoting *Chambers v. Mississippi,* 410 U.S. 284, 295 (1973)). Relevant

23   evidence may be excluded for failure to comply with procedural requirements, and "any number

24

of familiar and unquestionably constitutional evidentiary rules also authorize the exclusion of

relevant evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (plurality opinion). "While the

Constitution ... prohibits the exclusion of defense evidence under rules that serve no legitimate

purpose or that are disproportionate to the ends that they are asserted to promote, well-

established rules of evidence permit trial judges to exclude evidence if its probative value is

outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential

to mislead the jury." *Holmes*, 547 U.S. 319, 326 (2006).

     1.  *Ground 1*

     In Ground 1, Petitioner contends the trial court erred when it excluded videotapes of the

deputies' reenactment of the crime scene and shooting. *See* Dkt. 6. In determining if Petitioner's

right to present a defense was violated when the trial court excluded the videotapes, the state

court of appeals stated:

> At issue here is the admissibility of the "moving statement" videotapes made at
> the direction of Rod Englert, the State's crime reconstructionist. Taken at the
> Eggleston home in April 1996, these videotapes showed Deputies Dogeagle,
> Larson, Reigle, Fajardo, and Reding reenacting their movements during the
> shooting while Englert interviewed them and asked questions about their actions.
> Englert used these videotapes to help form his opinions about the shooting. In
> each of Eggleston's trials, the defense sought to introduce the videotapes during
> Englert's cross-examination.
>
> The State objected to the tapes in the first two trials because the tapes were too
> dark. During the first trial, the trial court refused to play the videotapes for the
> jury because the lighting did not "in any sense" replicate the lighting in the house
> at the time of the shootings. RP at 1385. The court concluded that the defense
> could cross-examine Englert from a transcript of the videotapes. The judge at the
> second trial reached the same conclusion.
>
> When the State again sought to exclude the videotapes in the third trial, the
> defense announced that it had lightened the tapes and would file the lightened
> copies the following day.
>
> One week later, the parties and the court viewed the lightened Reding videotape
> but the voice and the movements were not synchronized. The defense explained

that it wanted to use the videos to cross-examine some of the deputies and Englert because "we believe ... what they told him is inconsistent with what he reports and what his opinion is." RP at 2034. The parties then viewed the Dogeagle tape, after which the defense stated that it was not particularly interested in the video. The court asked the parties to review the lightened videos and present argument at another time.

During redirect examination of Deputy Dogeagle, the last deputy to testify, the State asked him about the two transcripts of the video (apparently, the State and the defense had prepared their own transcripts) and a discrepancy in their punctuation. When the State asked the court to display on a screen the parts of the two transcripts it was referring to, the defense objected, arguing that the best evidence would be the video itself. The parties eventually agreed to show the jury Exhibit 735, a shortened [two minute] version of the lightened Dogeagle tape. After both parties questioned Dogeagle about the video, the court admitted it for illustrative purposes only since Dogeagle had acknowledged the statements he made therein.

The court then asked about the other videotapes that the defense wanted to introduce, and the parties viewed the videos of Reigle, Larson, and Reding. After the State again objected to their introduction, the defense announced that it wanted to use only the tapes of Reigle, Reding, and Dogeagle: "Those videos are fundamental to my cross-examination of the timing and sequence of shots in this case." RP at 4885. The defense explained:

> This expert has testified ... about where shots were fired ... and his theory about the timing of the shots is totally ridiculous when you look at certain parts of the evidence.

> This witness has testified that this shooting occurred over a minute and 15 seconds period of time. When you look at what these people do on the videos, when you look at what they say and their movements through this little house, you realize and the jury will realize ... that this opinion is fundamentally flawed.

RP at 4893. The court responded that the jury had already seen the Dogeagle video and that its (sic) would admit only the Reigle and Reding transcripts. [Fn. "The trial court also explained that it had admitted the Dogeagle video because neither party had objected."]

During its cross-examination of Englert, the defense asked him about Reding's statement on the videotape transcript concerning Bananola's utterance of "ugh" as he started to collapse into the living room. RP at 4911. The issue was whether Bananola was shot before or as he was falling to the floor. The defense again sought to introduce the videotape itself. The State responded that the defense was

simply ignoring the deputy's testimony and that the video would not help. The court adhered to its earlier ruling, explaining:

> I think they're very misleading, particularly the tape of Deputy Reigle....
> [O]nce he walks into the kitchen, all you can see of him is a silhouette. All I can see of him is a silhouette, and yet I know if I had been standing there in the position of the cameraman, I would not have seen a silhouette ... my recollection of the videotape is Mr. Englert specifically instructed each of the deputies to take their time, go through in slow motion and act it out [.] [That] is not an accurate reflection of the time.
>
> With respect to movements ... this jury has already heard the testimony of these witnesses who have told the jury where they were standing, and I think that the defense counsel is adequately able to make their point without using the video in that regard. I think that the tape is very misleading.
>
> In addition to all of that, it clearly shows ... a large hole in the wall. The large hole in the wall was ... not caused by the gunfire itself, but rather was caused by the State's investigators who removed a section of the wall to retrieve the bullets. The Court of Appeals has suppressed the bullets.... So we leave ourselves ... in the very difficult position of having a hole in the wall that would again be misleading to the jury because the jury could be left with the impression that that was caused from the gunfire itself[.] [W]e're not in a position to explain to them why there is this hole in the wall because the bullets are suppressed.

RP at 4972–75.

During the cross-examination of Kay Sweeney, the defense reconstruction expert, the State asked what Reding said about the sequence of events during the shooting. The defense objected, stating that the best evidence of what Reding said was in the video. When the State asked more questions about the deputies' statements on the videotape, the defense again objected on the grounds that it could not show the videos to Sweeney to clarify and support his testimony. The State responded that it was asking only about the deputies' statements, and the court again ruled that the defense could use the transcripts of the videos.

Eggleston argues on appeal that when the court excluded the videotapes during Englert's cross-examination, it violated his right to present a defense. [Fn. "Contrary to the statement in the appellant's brief, Eggleston never sought to use the videos in cross-examining the deputies. The defense did ask Reding, Fajardo, and Reigle to show the jury their movements by using diagrams of the house's interior."] The trial court has discretion to determine the scope of cross-examination; we will reverse a trial court's rulings on that scope only for a

manifest abuse of discretion. *State v. McDaniel*, 83 Wash.App. 179, 184–85, 920 P.2d 1218 (1996); ER 611(b).

The Sixth Amendment to the United States Constitution and Washington Constitution article 1, section 22 guarantee criminal defendants the right to confront and cross-examine adverse witnesses. *McDaniel*, 83 Wash.App. at 185, 920 P.2d 1218. Although the right is constitutional, it is subject to limitations: (1) the offered evidence must be relevant; and (2) the defendant's right to introduce relevant evidence must be balanced against the State's interest in precluding evidence so prejudicial as to disrupt the fairness of the fact-finding process. *McDaniel*, 83 Wash.App. at 185, 920 P.2d 1218. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Any attempt to limit meaningful cross-examination, however, must be justified by a compelling state interest. *State v. Hudlow,* 99 Wash.2d 1, 15–16, 659 P.2d 514 (1983) (citing *People v. Redmon,* 112 Mich.App. 246, 255, 315 N.W.2d 909 (1982)).

The trial court may admit demonstrative evidence if the experiment was conducted under conditions reasonably similar to those existing at the actual event. Whether the similarity is sufficient is for the trial court's discretion. *State v. Stockmyer,* 83 Wash.App. 77, 83, 920 P.2d 1201 (1996). When evidence is not entirely accurate, the court may exclude it to avoid confusing the jurors. 5 Karl Tegland, Washington Practice: Evidence § 403.4, at 368–69 (4th ed.1999).

A review of the three videotapes at issue shows that the darkness problem identified in Eggleston's two previous trials was largely overcome. Problems with synchronizing the voice and the movements in the Reding tape do exist, however, and the trial court was correct that Deputy Reigle appears as a silhouette in much of his videotape. Moreover, the Reigle tape clearly shows the hole in the wall left from the removal of the subsequently suppressed bullets. And, as the trial court mentioned, Englert instructs each deputy to repeat his actions in slow motion.

Eggleston now argues that excluding the tapes was error under the best evidence rule and the rule of completeness. ER 1002, ER 106. Generally, a party who wants to prove the contents of a writing, recording, or photograph must use the original. ER 1002; 5C Karl Tegland, Washington Practice: Evidence § 1002.1, at 238 (4th ed.1999). And if a party introduces part of a writing or recorded statement, the opposing party may require the introduction of any other part "which ought in fairness to be considered contemporaneously with it." ER 106; 5 Karl Tegland, Washington Practice: Evidence § 106.1, at 115 (4th ed.1999). Eggleston did not refer to the best evidence rule until the cross-examination of defense witness Kay Sweeney, which was well after the court made its ruling concerning the videotapes, and the record does not show that he ever argued that excluding the tapes violated the rule of completeness. *See, e.g.,* ER 1002; ER 106.

1    A party may assign error on appeal only on the specific ground of the evidentiary
     objection made at trial, and that objection must be timely. *See Guloy,* 104
2    Wash.2d at 422, 705 P.2d 1182; *State v. Avendano–Lopez,* 79 Wash.App. 706,
     710, 904 P.2d 324 (1995).
3
     Even if we consider Eggleston's new arguments concerning the court's ruling, we
4    find no harmful error. Eggleston does not explain why the Dogeagle and Reigle
     tapes were essential to his impeachment of Englert. His discussion of Reding's
5    statements mirrors that made during trial, but he does not point to any flaw in the
     trial court's reasoning that the video would not have helped determine whether
6    Reding meant that Bananola was shot before or as he was falling. Moreover, the
     trial court had valid concerns about the quality of the videotapes, their potential
7    exposure of suppressed evidence, and the deputies' slow-motion reenactments of
     their movements. These concerns, coupled with the jury's visit to the house and
8    the defense counsel's use of the video transcripts to cross-examine Englert,
     persuade us that the trial court did not abuse its discretion in limiting Eggleston's
9    use of the videotapes during Englert's cross-examination.

10   Dkt. 27, Ex. 4, pp. 26-31 (footnotes omitted unless indicated); *Eggleston*, 129 Wash. App. at

11   438.

12       Petitioner asserts the videotapes of Deputies John Redding ("Reding Tape") Jeff Reigle

13   ("Reigle Tape"), and Warren Dogeagle ("Dogeagle Tape") were critical to his defense and to

14   effectively cross-examine the State's expert, Rod Englert. Dkt. 35. Petitioner argues the

15   videotapes were used by Mr. Englert to form his opinion that Petitioner fired into the victim's

16   head while the victim was laying on the floor. *Id*. at p. 3. Specifically, Petitioner contends the

17   trial court's decision to exclude the Reding Tape substantially interfered with Petitioner's right to

18   present a complete defense. *Id*. at pp. 6-10. Petitioner asserts the Reding Tape supported the

19   defense's theory that Petitioner did not commit an execution style killing and impeached Mr.

20   Englert's statements and Deputy Reding's testimony. *Id*. at pp. 7-10. Petitioner also argues, in a

21   conclusory manner, that his right to present a defense was violated when the trial court excluded

22   the Reigle Tape and the Dogeagle Tape. *Id*. at pp. 3-4.

23

24

1    As the state court of appeals thoroughly explained, the state court record shows Mr.

2  Englert created videos, which he called "moving statements," documenting several deputies

3  reenacting the deputies' actions prior to, during, and after the shooting in detailed, slow motion.

4  *See* Dkt. 41. At trial, Petitioner's trial counsel stated they intended to introduce the Reding Tape,

5  Dogeagle Tape, and Reigle Tape to cross-examine Mr. Englert. Dkt. 32, Ex. 89, pp. 4882-83.

6  Petitioner's trial counsel argued they wanted to use the videotapes to show the positioning of

7  individuals at the time of the shooting, the sequence of the shooting, and the timing of the

8  shooting. *Id.* at pp. 4890-91, 4892-93. The State maintained the videos had lighting problems,

9  which would prejudice the jury, and were not inconsistent with Mr. Englert's testimony. *Id.* at

10  pp. 4881-82, 4885-86.

11    In excluding the videotapes, the trial court found the videotapes had inherent technical

12  problems unrelated to the lighting issue. *See id.* at pp. 4887-90. The trial court found the Reding

13  Tape went completely blank at one point, there were problems with freeze framing, and Deputy

14  Reding repeated the same scenario two or three times. *Id.* Regarding the Reigle Tape, the trial

15  court found it was difficult to see anything except Reigle's silhouette, which was not

16  representative of what Mr. Englert saw when the Reigle Tape was being created. *Id.* at pp. 4887-

17  88, 4894-95, 4896. The trial court noted that it did not find it necessary for Petitioner's trial

18  counsel to show the Dogeagle Tape given the infirmities of the video. *Id.* at 4888. The trial court

19  found that, overall, the videotapes had inherent problems. *Id.* at pp. 4889-90. The trial court ruled

20  the transcripts from the Reding Tape and Reigle Tape could be used to effectively cross-examine

21  Mr. Englert. *Id.* at pp. 4895-96. An excerpt from the Dogeagle Tape had already been introduced

22  for the jury to view because the parties had not objected. *See id.* at p. 4890.

23

24

1         The following day, the trial court provided additional discussion regarding the

2    videotapes, holding the videotapes were misleading. Dkt. 32, Ex. 90, pp. 4972-73. It noted

3    Petitioner's trial counsel stated the videotapes were necessary to impeach witnesses regarding

4    timing, but counsel had "backed off as a purpose for [the videotapes] being necessary." *Id*. at

5    4973. The trial court emphasized again the fact the videotapes were in slow-motion and not an

6    accurate reflection of the timing. *Id*. Additionally, the trial court found the Reigle Tape showed a

7    large hole in the wall, which was not caused by gunfire, but was part of the process to remove

8    bullets from the wall. *Id*. at p. 4974. The trial court stated the hole in the wall would be

9    misleading to the jury because the jury could be left with the impression that the hole was caused

10   by gunfire and, because the bullets had been suppressed, the hole could not be explained to the

11   jury. *Id*. at pp. 4974-75.

12        On cross-examination of Mr. Englert, Petitioner's trial counsel asked Mr. Englert

13   questions about the videotapes. *See* Dkt. 32, Ex. 89, pp. 4791-93, 4812. Petitioner's trial counsel

14   also used the Reding Tape transcript to show Deputy Reding's statements conflicted with Mr.

15   Englert's opinion. *See id*. at pp. 4910-12. Petitioner's trial counsel again renewed his request to

16   show the Reding Video, which the trial court denied. *See id*. at pp. 4912-15. Following the trial

17   court's ruling, Petitioner's trial counsel continued to cross-examine Mr. Englert regarding

18   statements made in the Reding Tape. *Id*. at pp. 4916-30.

19        During cross-examination of Deputy Reding, Petitioner's trial counsel asked questions

20   regarding Deputy Reding's location in the home when the victim was shot. Dkt. 32, Ex. 78, p.

21   3173. Deputy Reding indicated his location on a demonstrative exhibit. *See id*. at pp. 3173, 3184.

22   Petitioner's trial counsel also used the transcripts from the Reding Tape to show Deputy

23

24

1  Reding's statements during the Reding Tape were inconsistent with his testimony during the

2  trial. *See id*. at pp. 3174, 3180-81, 3198-3200.

3      Petitioner's trial counsel also questioned Deputy Dogeagle about his positioning and the

4  positioning of other deputies during the shooting. *See* Dkt. 32, Ex. 87, pp. 4490-4505, 4515-19,

5  4521-25. Deputy Dogeagle was able to use a diagram to indicate positioning. *See id*. Petitioner's

6  trial counsel also impeached Deputy Dogeagle using statements Deputy Dogeagle made during

7  the Dogeagle Tape. *Id*. at p. 4519-21. On re-direct, the State and Petitioner's trial counsel agreed

8  to play a portion of the Dogeagle Tape, as it was the best evidence regarding a dispute over

9  punctuations in two separate transcripts from the Dogeagle Tape. *Id*. at p. 4535-51. The State

10 showed the portion of the Dogeagle Tape and, on re-cross, Petitioner's trial counsel asked more

11 questions regarding the portion of Dogeagle Tape that was shown to the jury. *Id*. pp. 4571-80.

12     Review of the Reding Tape shows the video turn completely blank at one point. *See* Dkt.

13 41, Ex. 637, Reding Tape. The audio cuts out at times, and it is unclear how much audio is

14 missing. *Id*. Further, the audio and video are not synchronized. *Id*. Deputy Reding repeated the

15 shooting scenario three times during the approximately eight minute video. *Id*. Review of the

16 videotape of Bruce Larson ("Larson Tape"), the Reigle Tape, and the Dogeagle Tape show the

17 three deputies are often only visible as silhouettes. Dkt. 41, Ex. 632, 633, 636. Further, the three

18 videos show a large hole in the wall, which Deputy Larson indicated was where bullets were

19 hitting the wall during the shooting. *Id*. at Ex. 632, 633, 636.

20     "Only rarely ha[s the Supreme Court] held that the right to present a complete defense

21 was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v.*

22 *Jackson*, 569 U.S. 505, 509 (2013) (per curiam). Even so, in some circumstances, state rules of

23 evidence cannot be used to prevent a defendant from presenting reliable evidence crucial to his

24

1    defense. *Washington v. Texas*, 388 U.S. 14, 22 (1967); *Chambers*, 410 U.S. at 302; *Rock*, 483

2    U.S. at 55–56.

3         Here, the state court of appeals found the trial court did not abuse its discretion in

4    limiting the use of the videotapes in light of the inherent problems with the videotapes, the

5    potential of the videotapes to show suppressed evidence, and the slow-motion reenactment of the

6    shooting. Petitioner only specifically alleges his right to present a defense was violated when he

7    was unable to introduce the Reding Tape. *See* Dkt. 35, pp. 3-10. Petitioner generally states the

8    trial court also refused to admit portions of the Reigle Tape and Dogeagle Tape, but provides no

9    argument explaining how this violated his right to present a defense. *See id.* at pp. 3-4.

10        The evidence shows the Reding Tape contains audio and video technical problems. As

11   discussed, the video contains visual and audio breaks and is not synchronized. The videotapes,

12   including the Reding Tape, are not in "real time" and do not depict the scene as it was on the day

13   of the shooting. For example, the lighting in the videotapes is not the same as the day of the

14   shooting and the deputies are verbalizing, in slow-motion, their actions and observations and the

15   deputies repeat their actions and statements several times for Mr. Englert. In addition, there are

16   other individuals shown in the videotape, one of whom attempts to re-enact the actions of

17   Bananola. Further, the videotapes show a large hole in a wall caused by bullets and removal of

18   the bullets, and the state court of appeals had already determined the bullets were inadmissible.

19        Petitioner was permitted to cross-examine Mr. Englert regarding the contents of the

20   Reding Tape and Reigle Tape through the videotape transcripts. Petitioner's trial counsel also

21   cross-examined Deputy Reding regarding his testimony of the shooting and, though Petitioner's

22   trial counsel had use of the transcript, he did not question Deputy Reding regarding his

23   statements about the sequence and timing of the shooting. A portion of the Dogeagle Tape was

24

introduced to the jury and Petitioner's trial counsel questioned Deputy Dogeagle regarding his

statements in the Dogeagle Tape. In addition, Petitioner's trial counsel questioned Deputy

Dogeagle regarding the positions of the deputies at the time of the shooting. Petitioner's trial

counsel also cross-examined Deputies Larson, Reigle, and Fajardo regarding their positioning at

the time of the shooting. *See* Dkt. 32, Ex. 71, pp. 1811-15, Ex. 79, pp. 3353-84, Ex. 84, pp. 4010-

68

        The record shows Petitioner was able to use transcripts from the videotapes to challenge

the State's theory of the case and to present his theory of the case. Petitioner was only limited in

his ability to present a visual viewing of the Reding Tape, Reigle Tape, and full Dogeagle Tape,

which had technical problems, were misleading, and contained suppressed evidence, to the jury.

As Petitioner was only limited from *showing* the videos, Petitioner fails to show the trial court's

decision to exclude the visual viewing of the Reding Tape, Reigle Tape, and full Dogeagle Tape

deprived Petitioner of his right to present a defense. *See Michigan v. Lucas*, 500 U.S. 145, 149

(1991) (internal quotations omitted) ("trial judges retain wide latitude to limit reasonably a

criminal defendant's right to cross-examine a witness based on concerns about, among other

things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is

repetitive or only marginally relevant"); *Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (1987) (a

defendant is not entitled to cross-examination that is effective in whatever way, and to whatever

extent, the defense might wish); *Franklin v. Warden, Mule Creek State Prison*, 2014 WL

7433752, at *85 (E.D. Cal. Dec. 31, 2014) (finding a writ was not justified "when the redaction

of a video did not prevent petitioner from presenting evidence crucial to his defense, but rather

only evidence that would, perhaps only marginally, bolster his presentation").

The Court concludes Petitioner fails to demonstrate the state court's conclusion finding Petitioner's right to present a defense was not violated when the trial court excluded the videotapes was contrary to, or was an unreasonable application of, clearly established federal law, or was an unreasonable determination of the facts in light of the evidence presented in this case. Accordingly, Ground 1 should be denied.

### 2.  *Ground 2*

In Ground 2, Petitioner contends the trial court erred when it excluded: (a) testimony from defense expert Kay Sweeney about how contaminated the crime scene was; (b) evidence that Steve McQueen, a State witness, was given reduced charges for testifying; (c) evidence tending to show Deputy Ben Benson lied; and (d) evidence showing Petitioner was awakened by the deputies. Dkt. 6, pp. 26-27.

### a.  Defense Expert Kay Sweeney

First, Petitioner asserts his right to present a defense was violated when the trial court limited the testimony of Kay Sweeney, Petitioner's expert. Dkt. 6, 35. The state court of appeals found the trial court did not err when it excluded portions of the testimony of Mr. Sweeney. In reaching its conclusion, the state court of appeals found:

> During Sweeney's direct examination, the defense sought to question him about how the State's investigation contaminated the crime scene and adversely affected the opinions of the State's expert, Rod Englert, about what happened during the shootings. Defense counsel contended that "[o]nce you destroy or modify a scene, the conclusions become unreliable." RP at 5366. The State objected and asked for an offer of proof explaining how the alleged contamination affected the crime scene reconstruction efforts, arguing that Sweeney could not testify simply that the ability to reconstruct the crime scene was hampered because of what the State had done. "It needs to be tied to specific elements of reconstruction and specific items that we're talking about." RP at 5369. The court ruled that Sweeney could testify how the debris left on the gold chair in the living room could have contaminated the evidence found thereon; it also ruled that he could explain how moving items during the investigation might have resulted in blood transfers. The court agreed, however, that the defense had to make an offer of proof about how

removing the sheetrock from portions of the wall affected the subsequent bloodstain analysis. (The parties had already stipulated to DNA results showing that certain bloodstains came from Bananola and others from Eggleston.)

In his offer of proof, Sweeney explained that the particulate matter from the removed bloodstained sheetrock could have been spread throughout the house during the investigation, but he acknowledged that he was concerned about only one area of blood in the hallway. He also admitted that he had been able to form opinions about what happened during the shooting despite the crime scene alterations. He did not specifically challenge any of Englert's conclusions.

Following that offer of proof, the court ruled:

> Okay ... [w]ith respect to his comments on the DNA ... he's not qualified to speak to this issue, but also it flies in the face of the stipulation.... So it's inconsistent with the defense's position in signing the stipulation, it seems to me, to have their own expert then attacking the stipulation that they signed and that's already been read to the jury. So I don't want you eliciting any testimony from him in that regard.

> [Y]ou can ... elicit ... testimony with respect to the chair, [and] with respect to ... the south facing portion of the north section of the archway.... He can talk about any mixtures of blood that weren't stipulated to as to how they could have come to be there by activities that may have occurred after the actual shooting took place ... but I don't want general, broad testimony of it affecting all of the reliability of all the conclusions, because that's not what, in fact, he has indicated in his testimony.

> With respect to the sheetrock, I'm still not going to allow it in. He ... stated that it didn't change his opinion as to the donor or identity of the blood that was in the north-south hallway which is where the sheetrock is. Although, I understand you want him to talk about how removing it can transfer blood and there's some potential there of saying well, somebody else's blood was on the wall, the wall was knocked out, that blood was then dissipated or dispersed somewhere else and therefore this portion of the puzzle we can't put together because we don't know if it was originally on the wall or not, but I didn't hear him testify to that.

> Now, if you were going to elicit that type of testimony, that was your opportunity to do so, or I would ... have him come back in. Unless he's going to testify to something like that, I heard him very clearly that the blood that was on the floor, he doesn't take any issue with the identity of the donor of that blood despite the issue of the sheetrock.... [N]obody has testified ... that somebody else's blood was on that wall that may have changed how this is being reconstructed by him or by Mr. Englert; it's

> only misleading and prejudicial and gets us into opening the door to evidence that was suppressed.
>
> RP at 5389–92. On appeal, Eggleston claims that this ruling prevented Sweeney from testifying about how sheetrock strewn over the house contaminated vast areas of the crime scene and therefore prevented him from testifying with any reliability about what occurred.
>
> This claim largely ignores the trial court's ruling regarding Sweeney's offer of proof, and it overlooks as well the detail with which Sweeney testified "with reasonable scientific certainty" about what happened during the shooting. RP at 5508–33. Eggleston has not shown that the trial court abused its discretion in restricting Sweeney's testimony about the effect of contamination on Englert's reconstruction efforts.

Dkt. 27, Ex. 4, pp. 33-35 (footnote omitted); *Eggleston*, 129 Wash. App. at 438.

The state court record shows, during the offer of proof, Mr. Sweeney testified there was debris at the crime scene causing potential contamination, which could impact the reliability of the blood evidence or other trace evidence. Dkt. 32, Ex. 92, pp. 5373-77. Mr. Sweeney, however, stated the debris did not cause him to question any DNA results because the DNA results were not "mixtures." *Id.* at p. 5380. Mr. Sweeney testified he was concerned his opinion related to the bloodstain deposits around the sheetrock at the crime scene were somewhat qualified because he had to rely on original photographs due to the contamination. *Id.* at p. 5383. He stated he was still able to form opinions despite the contamination and the contamination was not a part of his opinions. *Id.* at pp. 5386-87.

The trial court ruled Mr. Sweeney could not testify regarding DNA evidence because Mr. Sweeney was not qualified and his testimony contradicted the parties' stipulation regarding the DNA evidence. *Id.* at p. 5389. The trial court found Petitioner's counsel could elicit testimony regarding a chair, a specific area of the residence, and any mixtures of blood not in the stipulation. *Id.* at p. 5390. The trial court determined Petitioner's counsel could not elicit testimony regarding broad generalizations about the reliability of the State's expert's conclusions

1    or the sheetrock. *Id*. at pp. 5390-91. Regarding evidence of sheetrock contamination, the trial

2    court found any testimony would be misleading, prejudicial, and open the door to suppressed

3    evidence. *Id*. at 5390-92.

4        The state court of appeals found Petitioner did not show the trial court abused its

5    discretion in restricting portions of Mr. Sweeney's testimony about the effect of contamination

6    on Mr. Englert's reconstruction efforts. Dkt. 27, Ex. 4, pp. 33-35.

7        The Supreme Court has never squarely addressed "whether a court's exercise of

8    discretion to exclude expert testimony violates a criminal defendant's constitutional right to

9    present evidence." *Moses v. Payne*, 555 F.3d 742, 758 (9th Cir. 2009). "Likewise, there is no

10    Supreme Court authority which would bar a trial court from exercising discretion in disallowing

11    expert testimony." *Brooks v. Yates*, 2017 WL 3641731, at *29 (E.D. Cal. Aug. 24, 2017).

12    Therefore, Petitioner's bare assertions that the trial court erred in exercising its discretion in

13    excluding portions of Mr. Sweeney's testimony fails to show the state court's determination is

14    contrary to clearly established federal law. *See Stenson v. Lambert,* 504 F.3d 873, 881 (9th

15    Cir.2007) ("Where the Supreme Court has not addressed an issue in its holding, a state court

16    adjudication of the issue not addressed by the Supreme Court cannot be contrary to, or an

17    unreasonable application of, clearly established federal law.").

18        Furthermore, Petitioner has not shown how his right to present a defense was violated by

19    the state court rulings. *See* Dkt. 35. Petitioner states the state court's conclusion either ignores or

20    misreads Mr. Sweeney's offer of proof. Dkt. 35, pp. 10-11. Petitioner contends Mr. Sweeney

21    testified that contamination made any attempt to reconstruct the crime scene unreliable and the

22    jury should have been able to consider and weigh "that opinion evidence." *Id*. at p. 11. However,

23

24

1 Petitioner does not cite to, nor does the Court find, testimony showing Mr. Sweeney determined

2 any crime scene reconstruction would be unreliable. *See id*.

3       As detailed above, the evidence shows Mr. Sweeney did not question the reliability of the

4 DNA results. Mr. Sweeney testified he was concerned about samples related to the sheetrock at

5 the crime scene; however, the trial court found Mr. Sweeney's testimony regarding the sheetrock

6 was misleading, prejudicial, and opened the door to suppressed evidence, including bullets that

7 had been suppressed by the state court of appeals. Mr. Sweeney further testified he was able to

8 form opinions despite the contamination. He did not testify that the contamination, including the

9 sheetrock debris, changed the reliability of his or Mr. Englert's reconstruction or opinions. In

10 addition, the trial court allowed testimony related to the contamination of the crime scene and the

11 trial court only limited testimony which (1) was outside Mr. Sweeney's qualifications, (2)

12 contradicted the parties' stipulation, (3) made broad generalizations about the reliability of the

13 State's expert's conclusions, or (4) was misleading, prejudicial, or opened the door to suppressed

14 evidence.

15       Petitioner has not explained how the exclusion of portions of Mr. Sweeney's testimony

16 undermined the fundamental elements of Petitioner's defense. Therefore, Petitioner has failed to

17 show the trial court's decision to limit portions of Mr. Sweeney's testimony deprived Petitioner

18 of his right to present a defense. *See Taylor*, 484 U.S. at 410 (holding that a defendant "does not

19 have an unfettered right to offer testimony that is incompetent, privileged, or otherwise

20 inadmissible under standard rules of evidence"); *Moses*, 555 F.3d at 757 (the exclusion of

21 evidence pursuant to a state rule does not violate a defendant's right to present a defense unless

22 doing so "significantly undermined fundamental elements of the defendant's defense"); *Shumate*

23 *v. Newland*, 75 F. Supp. 2d 1076, 1088 (N.D. Cal. 1999) (holding the state court's decision was

24

1  not unreasonable when the trial court restricted the petitioner's expert from testifying about the

2  effectiveness of the techniques used by the prosecution's expert or impeach the testimony of a

3  prosecution's witness).

4        For these reasons, the Court concludes Petitioner fails to demonstrate the state court's

5  conclusion finding Petitioner's right to present a defense was not violated when the trial court

6  limited Mr. Sweeney's testimony was contrary to, or was an unreasonable application of, clearly

7  established federal law, or was an unreasonable determination of the facts in light of the evidence

8  presented in this case.

9              b.  Steve McQueen

10       Second, Petitioner contends his right to present a defense was violated when the trial

11 court limited the scope of cross-examination of Steve McQueen, a State witness. Dkt. 6, 35. In

12 finding the trial court did not violate Petitioner's right to present a defense when it excluded

13 evidence showing Mr. McQueen's bias, the state court of appeals found:

14       McQueen, a convicted felon, provided the information that launched the
          Eggleston investigation. When the State sought to prevent the defense from
15       asking about McQueen's original charges, as opposed to those to which he
          pleaded guilty, the defense responded that the issue went to bias. The matter was
16       left unresolved until the defense asked McQueen on cross-examination if he knew
          "Mr. Horne." RP at 2817. When the court sustained the State's objection, the
17       defense explained outside the jury's presence that it wanted to ask McQueen
          whether Horne appeared at his 1996 sentencing and made statements about his
18       cooperation in the Eggleston case.

19       The State responded that when McQueen pleaded guilty to "several counts of
          robbery in the first degree" in 1996, it explained to him that reducing the number
20       of charges was unrelated to his testimony in the Eggleston case. RP at 2849. The
          State told the defense at the time that for McQueen's safety in prison, it would
21       separate him from Eggleston, and that it would tell the sentencing judge that
          McQueen had cooperated in the Eggleston case. McQueen testified at Eggleston's
22       second and third trials without receiving any benefit. The State took the position
          that what happened in 1996 was not relevant to McQueen's testimony in 2002,
23       and the defense made no further argument.

24

1       Eggleston now argues that the trial court erred in excluding evidence that the
    State reduced the charges against McQueen in exchange for his testimony against
2   Eggleston. The defendant has a right to cross-examine a witness about possible
    bias, but the scope or extent of such cross-examination is within the trial court's
3   discretion. *State v. Roberts,* 25 Wash.App. 830, 834, 611 P.2d 1297 (1980). The
    trial court may prohibit further questioning where the claimed bias is speculative
4   or remote. *State v. Benn,* 120 Wash.2d 631, 651, 845 P.2d 289 (1993). Where a
    case stands or falls on the credibility of essentially one witness, that witness's
5   credibility or motive must be subject to close scrutiny. *Roberts,* 25 Wash.App. at
    834, 611 P.2d 1297; *see also Giglio v. United States*, 405 U.S. 150, 155, 92 S.Ct.
6   763, 31 L.Ed.2d 104 (1972) (new trial required where State did not disclose
    promise of leniency to key witness).

7
        Although Eggleston argues that excluding the evidence of McQueen's bias is
8   analogous to the exclusion of the "deal" in *Giglio*, important differences exist.
    Any evidence of bias here is both speculative and remote; it concerns a promise of
9   leniency that occurred six years before the testimony at issue and that the State
    largely denies. Moreover, McQueen was not a key witness; he did not testify
10  about the officers' entry into the Eggleston home or the gun battle. His testimony
    merely set the stage for Deputy Benson's investigation. The trial court did not
11  abuse its discretion in excluding the evidence of McQueen's alleged bias.

12  Dkt. 27, Ex. 4, pp. 32-33; *Eggleston*, 129 Wash. App. at 438.

13      The state court record shows Mr. McQueen testified regarding purchasing marijuana

14  from Petitioner in the months prior to the shooting. *See* Dkt. 32, Ex. 76, pp. 2762-2819. Mr.

15  McQueen testified that he had not been promised anything or received anything for his testimony

16  during the trial. *Id*. at pp. 2805-06.

17      During cross-examination of Mr. McQueen, Petitioner's trial counsel attempted to

18  discuss Mr. McQueen's convictions to show bias. *Id*. at p. 2817. The State objected and the trial

19  court held a side bar conference and sustained the State's objection. *Id*. The following day, the

20  trial court made a record of the side bar conference at the request of Petitioner's trial counsel. *Id*.

21  at Ex. 77, pp. 2848-50. The State explained that Mr. McQueen entered a guilty plea in 1996 to

22  several counts of robbery in the first degree. *Id*. at p. 2849. The State advised Petitioner's trial

23  counsel that the State asked Mr. McQueen to testify at Petitioner's first trial, but the reduction of

24

1  charges was in no way related to his testimony at the trial. *Id*. After Mr. McQueen testified at

2  Petitioner's first trial, the State sought to enhance Mr. McQueen's safety in prison by separating

3  Petitioner and Mr. McQueen. *Id*. Mr. McQueen testified again in Petitioner's 1998 re-trial and

4  his 2002 re-trial – the trial which is the basis for this Amended Petition– without the benefit of

5  any agreement or reward from the State. *Id*. at 2850. The State's position was that the events in

6  1997 were irrelevant to the testimony Mr. McQueen provided in 2002. *Id*.

7       A "defendant does not have the unrestricted right to cross-examine adverse witnesses on

8  any matter desired. Initially[,] the cross-examination must be shown to be relevant. The

9  determination of relevancy is within the discretion of the trial court." *Skinner v. Cardwell*, 564

10  F.2d 1381, 1388 (9th Cir. 1977).[5] Here, Mr. McQueen testified that he was not promised and did

11  not receive anything in return for his testimony at Petitioner's 2002 trial. During the sidebar

12  conference, the State argued Mr. McQueen's past criminal convictions were not relevant to Mr.

13  McQueen's 2002 testimony. The trial court agreed and sustained the State's objection to

14  Petitioner's trial counsel's line of questioning regarding Mr. McQueen's potential bias as a result

15  of his 1996 plea deal. There is no evidence showing Mr. McQueen received anything from the

16  State, such as a reduction in the number of charges, because he agreed to testify at Petitioner's

17  2002 trial. Further, Mr. McQueen was sentenced in 1996, which was six years prior to testifying

18  at Petitioner's 2002 trial. Therefore, the evidence supports the state court of appeals' finding that

19  Mr. McQueen's bias was remote and speculative. The Court also notes Mr. McQueen was not a

20  key witness regarding the murder and assault charges, which were the only charges in the 2002

21  trial. *See* Dkt. 32, Ex. 76, pp. 2762-2819 (no evidence Mr. McQueen was present during the

22

23      [5] Although Supreme Court precedent provides the only relevant source of clearly established federal law for AEDPA purposes, circuit precedent can be "persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme court law," and in ascertaining "what law

24  is 'clearly established.'" *Duhaime v. Ducharme*, 200 F.3d 597, 600–01 (9th Cir. 2000).

1  shooting). As such, Petitioner has not shown he was prejudiced because he was unable to

2  question Mr. McQueen regarding any potential bias.

3        Petitioner has failed to show the trial court's decision to exclude evidence regarding Mr.

4  McQueen's potential bias deprived Petitioner of his right to present a defense. *See Harrington v.*

5  *Jackson*, 1 Fed. App'x 367, 372 (6th Cir. 2001) (finding a weak motive of bias did not result in

6  the exclusion of critical evidence denying the petitioner his right to present a defense). Therefore,

7  the Court concludes Petitioner fails to demonstrate the state court's conclusion that Petitioner's

8  right to present a defense was not violated when the trial court excluded bias evidence related to

9  Mr. McQueen was contrary to, or was an unreasonable application of, clearly established federal

10  law, or was an unreasonable determination of the facts in light of the evidence presented in this

11  case.

12                c.  Deputy Benson's Veracity

13        Petitioner alleges the trial court erred when it excluded evidence showing Deputy Ben

14  Benson lied in his affidavit in support of the search warrant for Petitioner's home. Dkt. 6, 35.[6]

15  The state court of appeals found the trial court did not err when it excluded evidence showing

16  Deputy Benson lied in the search warrant affidavit, stating:

17          Eggleston argues that the trial court erred in excluding evidence that Deputy
        Benson lied in the search warrant affidavit when he described witnessing two

18          controlled buys between McQueen and Eggleston. The State objected to this
        proposed line of testimony because this court ruled that the affidavit was valid in

19          Eggleston's previous appeal. The State contended that Eggleston was simply
        attempting to argue once again that the affidavit and search warrant were invalid.

20          (In upholding the affidavit, we found that it did not refer to the first buy and that

21

22                   _____

      [6] In addition to arguing the state court did not err in excluding evidence regarding Deputy Benson's

23  truthfulness in the search warrant affidavit, Respondent provides argument regarding allegations that the trial court
erred in excluding evidence showing Deputy Jeff Reigle made inconsistent statements. *See* Dkt. 25. Petitioner did
not allege his right to present a defense was violated when evidence of Deputy Reigle's inconsistent statements were

24  excluded. *See* Dkt. 6, 35. Therefore, the Court declines to discuss Respondent's argument regarding Deputy Reigle.

Benson's failure to mention that Eggleston's girlfriend was present during the second buy was not a material omission.)

The defense argued that it was challenging only Benson's credibility, but the State disagreed: "How can the jury be the judge of Benson's credibility unless they know what the legal standard is for issuance of a warrant and the requirements for what's included in a search warrant affidavit." RP at 50. The trial court agreed. But on cross-examination, the court allowed the defense to ask Benson whether the buy he witnessed was technically a controlled buy. Benson admitted here, as he had in prior proceedings, that the transaction was not actually a controlled buy. The defense then sought to cross-examine Benson about whether he lied to the judge to whom he applied for a search warrant about the buy and whether he told the judge that there were other people present. The trial court sustained the State's objection to the question, explaining that it would not allow any attack on the search warrant.

Eggleston now argues that this ruling "violates state evidentiary rules," but he does not explain how such a violation occurred. Generally, a party may not impeach a witness on a collateral matter. *See State v. Griswold,* 98 Wash.App. 817, 831, 991 P.2d 657 (2000). Whether Benson misrepresented the facts of the drug purchases from Eggleston in his search warrant affidavit is collateral to the core issue of how the shootings occurred. The trial court did not err in limiting the defense cross-examination on the issue.

Dkt. 27, Ex. 4, pp. 35-36; *Eggleston*, 129 Wash. App. at 438.

The state court record shows, prior to trial, the trial court heard argument regarding whether it was appropriate for issues surrounding the search warrant to be used in Petitioner's argument or for cross-examining a witness. Dkt. 32, Ex. 60, p. 40. The State argued the state court of appeals found the search warrant was lawful and, therefore, it would be inappropriate for Petitioner to assert the search warrant was improper either through argument or in questioning a witness. *Id*. at pp. 40-41. Petitioner's trial counsel argued Deputy Benson's affidavit in support of the search warrant included material misrepresentations, and the jury needed to be aware of this information to determine Deputy Benson's credibility. *See id*. at pp. 41-44. The trial court stated that the state court of appeals disagreed with Petitioner's trial counsel's arguments. *Id*. at p. 46. The trial court noted the state court of appeals determined the affidavit established

1    probable cause and did not contain intentional or reckless omissions that affected the

2    establishment of probable cause. *Id*. at p. 47. The trial court excluded any testimony that would

3    contradict the state court of appeals' decision. *Id*.

4        During the cross-examination of Deputy Benson, Petitioner's trial counsel sought to

5    question Deputy Benson regarding information provided in the affidavit used to obtain the search

6    warrant. *See* Dkt. 32, Ex. 69, p. 1544. Petitioner's trial counsel argued that Deputy Benson

7    omitted information in the affidavit and, therefore, the jury should hear evidence regarding

8    Deputy Benson's untruthfulness for purposes of credibility. *Id*. at pp. 1544-45. The trial court

9    again ruled Petitioner's trial counsel could not raise issues regarding the search warrant on cross-

10   examination of Deputy Benson. *Id.* at p. 1547.

11       "[C]ourts will not find a constitutional violation based on the exclusion of evidence

12   proffered by the defense if the excluded evidence was, among other things, only marginally

13   relevant or repetitive, incompetent, privileged, poses an undue risk of harassment, prejudice, or

14   confusion of the issues, or is otherwise inadmissible." *Hansen v. Long*, 2014 WL 3435871, at

15   *10 (C.D. Cal. Jan. 28, 2014) (citing *Montana*, 518 U.S. at 42; *Crane*, 476 U.S. at 689–90;

16   *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). Here, the evidence shows the state court of

17   appeals found the search warrant was valid and Deputy Benson did not act improperly in

18   securing the search warrant; therefore, the trial court excluded evidence related to the content of

19   the search warrant. Petitioner's trial counsel sought to use collateral evidence – the search

20   warrant and supporting affidavit – to impeach Deputy Benson. *See United States v. Higa*, 55

21   F.3d 448, 452 (9th Cir. 1995) ("A collateral contradiction is typically one on a point not related

22   to the matters at issue, but designed to show that the witness' false statement about one thing

23   implies a probability of false statements about the matters at issue."). However, attempting to

24

1  cast doubt on Deputy Benson's credibility by questioning him regarding the search warrant

2  affidavit could call into question the validity of the search warrant. The evidence regarding the

3  search warrant was also not directly related to the shooting. Further, Petitioner's trial counsel

4  was able to cross-examine Deputy Benson and attempt to impeach him in other ways. The trial

5  court only excluded evidence related to the search warrant.

6      Petitioner was able to cross-examine Deputy Benson and was only limited in questioning

7  Deputy Benson regarding the search warrant, which had been upheld as proper by the state court

8  of appeals prior to the trial and was unrelated to the shooting. Therefore, Petitioner fails to show

9  the state court of appeals' conclusion that Petitioner's right to present a defense was not violated

10 when the trial court excluded evidence related to the search warrant during the cross-examination

11 of Deputy Benson was contrary to, or was an unreasonable application of, clearly established

12 federal law, or was an unreasonable determination of the facts in light of the evidence presented

13 in this case. *See Higa*, 55 F.3d at 452 (internal quotation omitted) ("The district court has broad

14 discretion over whether to admit extrinsic evidence to rebut a witness' direct testimony,

15 particularly on a matter collateral to the case."); *Jackson*, 569 U.S. at 512 (emphasis in original)

16 ("[T]his court has never held that the confrontation clause entitles a criminal defendant to

17 introduce *extrinsic evidence* for impeachment purposes."); Fed. R. Evid. 608(b) (prohibits use of

18 extrinsic proof on a collateral matter of specific instances of a witness's conduct to attack

19 credibility).

20          d.   Petitioner's Habit

21      Finally, Petitioner asserts the trial court erred when it excluded evidence tending to show

22 Petitioner was awakened by the deputies. Dkt. 6, p. 27. The state court of appeals found the trial

23

24

1   court did not abuse its discretion when it excluded testimony regarding Petitioner's habits,

2   finding:

> Eggleston contends that the trial court erred in not allowing the defense to cross-examine his girlfriend, Tiffany Patterson, about whether Eggleston tended to fall asleep after she gave him his medicine in the morning before she left for work.
>
> Patterson testified on direct that she gave Eggleston his medicine before she left the house on October 16, 1995, and that she did not know whether he was awake afterward. When the defense sought to ask whether the medication consistently made him sleepy, the court ruled against it. "[T]o the extent that you're trying to show that he acted in conformity with what he may have done in the past in response to medication, I'm not going to allow it. She has no personal knowledge of it." RP at 3273. The court did, however, allow the defense to refresh her memory with a prior inconsistent statement made during Eggleston's previous trial. When questioned about her prior testimony that Eggleston went back to sleep after receiving his medicine on October 16, Patterson acknowledged that "he laid back down." RP at 3275.
>
> Because Patterson had already testified that she did not know whether Eggleston had fallen asleep after she gave him his medicine on October 16, the trial court did not err in preventing her from testifying that he usually did go back to sleep. Habitual behavior consists of semi-automatic and specific responses to specific stimuli. *Wash. State Physicians Ins. Exchange & Ass'n v. Fisons Corp.,* 122 Wash.2d 299, 325, 858 P.2d 1054 (1993); *see also* ER 406. Patterson's direct testimony did not support a conclusion that Eggleston's sleepiness after receiving his morning medicine was habitual. In any event, this questioning was aimed at showing that the deputies awakened Eggleston on October 16, and the defense introduced evidence to that effect when the trial court allowed it to use Patterson's prior testimony.

17  Dkt. 27, Ex. 4, pp. 36-37; *Eggleston*, 129 Wash. App. at 438.

18      The record shows Tiffany Patterson, Petitioner's girlfriend at the time of the shooting,

19  testified she gave Petitioner medicine and a glass a milk around 7:30 a.m. on the morning of the

20  shooting. *See* Dkt. 32, Ex. 79, pp. 3246-47. Ms. Patterson stated that she did not know if

21  Petitioner was still awake after she gave him his medicine. *Id*. at p. 3247.

22      Prior to beginning cross-examination, Petitioner's trial counsel explained to the trial court

23  that he intended to question Ms. Patterson regarding her knowledge of Petitioner's habits when

24

REPORT AND RECOMMENDATION - 37

1    he took his medication. *Id*. at p. 3269. The State argued there was no foundation for Ms.

2    Patterson's testimony as to the medical effects of a drug on Petitioner. *Id*. at p. 3270. The trial

3    court allowed Petitioner's trial counsel to question Ms. Patterson regarding an inconsistent

4    statement made by Ms. Patterson about checking on Petitioner before she left for work. *Id*. at pp.

5    3270-71. The trial court stated Ms. Patterson would not, however, be allowed to testify as though

6    she was a medical expert. *Id*. at p. 3271. For example, Ms. Patterson could not testify as to the

7    effects of the medication on Petitioner. *Id*. at p. 3272. The trial court also determined Ms.

8    Patterson had no knowledge of how Petitioner responded to the medication on the day of the

9    shooting and, therefore, any testimony on that subject was impermissible. *Id*. at pp. 3272-73.

10       On cross-examination, Petitioner's trial counsel used previous inconsistent statements to

11   impeach Ms. Patterson regarding whether Petitioner laid down after he took his medication. *Id*.

12   at pp. 3274-75. Contrary to her testimony on direct, Ms. Patterson stated that Petitioner did lay

13   back down after he took his medication on the morning of the shooting. *Id*. at p. 3275.

14       The evidence shows the trial court excluded testimony from Ms. Patterson that would

15   have attempted to show Petitioner had a habit of sleeping after taking the medication Ms.

16   Patterson gave him. The Court notes, however, that there is no evidence showing Ms. Patterson

17   would have provided this testimony. Rather, it is mere speculation from Petitioner's trial counsel.

18   Further, Petitioner was allowed to present evidence that, on the morning in question, Petitioner

19   laid back down after he took his medication. As such, Petitioner was able to present evidence to

20   support his defense that he was asleep when the deputies entered his home.

21       Petitioner has not shown he was unable to present a defense because the trial court

22   excluded evidence that he had a habit of sleeping after taking his medication. Therefore, the

23   Court concludes Petitioner fails to demonstrate the state court's determination that Petitioner's

24

1  right to present a defense was not violated when the trial court excluded evidence related to

2  Petitioner's habits was contrary to, or was an unreasonable application of, clearly established

3  federal law, or was an unreasonable determination of the facts in light of the evidence presented

4  in this case.

5                       e.   Conclusion

6        For the above stated reasons, Petitioner has not shown the trial court's evidentiary

7  rulings, taken individually or as a whole, violated Petitioner's right to present a defense.

8  Therefore, the Court concludes Petitioner fails to demonstrate the state court's determination that

9  Petitioner's right to present a defense was not violated was contrary to, or was an unreasonable

10  application of, clearly established federal law, or was an unreasonable determination of the facts

11  in light of the evidence presented in this case. Accordingly, the Court recommends Ground 2 be

12  denied.

13       C.   Confrontation Clause (Ground 4)

14        In Ground 4, Petitioner contends the Confrontation Clause was violated when the trial

15  court excused Mr. Garn from attending the trial and allowed the State to read Mr. Garn's prior

16  testimony. Dkt. 6, pp. 28-29.

17        The Confrontation Clause of the Sixth Amendment provides: "In all criminal

18  prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against

19  him." U.S. Const. Amend. VI. The Confrontation Clause applies to the states through the

20  Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), and it guarantees criminal

21  defendants the right to confront and cross-examine the witnesses against them. *Chambers*, 410

22  U.S. at 294-95. "The main and essential purpose of confrontation is to secure for the opponent

23  the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974).

24

1    In *Crawford v. Washington,* the United States Supreme Court held that the Confrontation

2    Clause of the Sixth Amendment bars the admission of out-of-court "testimonial" statements

3    except when the declarant is unavailable and the defendant had a prior opportunity to cross-

4    examine the declarant. *Crawford,* 541 U.S. at 53–54. In reaching this conclusion, the Supreme

5    Court reasoned that the Confrontation Clause was "most naturally read as a reference to the right

6    of confrontation at common law, admitting only those exceptions established at the time of

7    founding. *Id.* at 54.

8    The Confrontation Clause "permits the introduction of out-of-court statements if they are

9    both necessary and reliable." *Barker v. Norris*, 761 F.2d 1396, 1399 (9th Cir. 1985). Necessity is

10    proven by showing a witness is unavailable to testify at trial. *United States v. Monaco*, 735 F.2d

11    1173, 1175 (9th Cir. 1984) (citing *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538–39, 65

12    L.Ed.2d 597 (1980)). "A witness is not 'unavailable' unless the prosecutor makes a good faith

13    effort to obtain the witness's presence." *United States v. Winn,* 767 F.2d 527, 530 (9th Cir.

14    1985). "The lengths to which a prosecutor must go to establish good faith is a question of

15    reasonableness." *Christian v. Rhode*, 41 F.3d 461, 467 (9th Cir. 1994). "[T]he deferential

16    standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a

17    state court's decision on the question of unavailability merely because the federal court identifies

18    additional steps that might have been taken. Under AEDPA, if the state-court decision was

19    reasonable, it cannot be disturbed." *Hardy v. Cross*, 565 U.S. 65, 72 (2011).

20    In concluding Petitioner's Sixth Amendment right to confront Mr. Garn was not violated,

21    the state court of appeals stated:

22    Ted Garn, a Tacoma Police Department forensic investigator, was assigned to
     collect evidence from the Eggleston home after the shooting. Under the direction
23    of Detective Melvin Margeson, he measured and photographed the interior of the
     residence; photographed and collected items of ballistic evidence; and collected

24

Bananola's bloody clothing, the guns Bananola and Eggleston used, the firearms found in Eggleston's bedroom, and blood samples.

At Eggleston's first two trials, Garn testified about collecting the ballistic evidence and blood samples. Defense counsel cross-examined him each time.

In 2001, Garn sustained serious, disabling injuries in a car accident. When the prosecuting attorneys learned that he might not be able to testify at Eggleston's third trial, they talked with Garn to encourage his cooperation. Garn explained that he could not remember any of the details of the Eggleston investigation and did not recognize the reports he had prepared. He also said that he had begun receiving treatment for post-traumatic stress caused by his Vietnam service.

Despite his reluctance to testify, Garn responded to a subpoena. He testified at a hearing that he believed he collected evidence at the Eggleston residence, but he could not recall picking up bullets and did not recognize a photograph that he took. Nor could he remember preparing reports. He said that he was experiencing severe pain and tremors as he testified, and he listed six medications that he was taking. Garn explained that he had been receiving counseling and medication for a post-traumatic stress disorder and would be entering the VA hospital for treatment as soon as a bed was available. He told defense counsel that he did not think reviewing documents would refresh his memory; and he could not bring himself to read a paragraph from one of his reports when the prosecuting attorney asked him to do so.

His wife, a registered nurse for 20 years, testified at the same hearing that Garn becomes traumatized and reacts violently when viewing violence on television; he has been told to avoid newspapers, television news, war movies, and crime dramas; and he is in constant pain from his neck and spinal surgeries. "He has a stainless steel plate with six screws on the front side of his neck, and the back of where the spinal column is, they put in some bone donor and some more screws and they wrapped his neck with stainless steel wire so he has no mobility." RP at 1247.

The State also presented a note from Garn's surgeon stating that Garn could not testify at Eggleston's trial due to his neck condition.

The State argued that Garn could not testify because of his memory loss and his physical and mental problems. The defense complained that it had no medical documentation of Garn's difficulties; the State explained that none would be available until after his VA evaluation, which would take at least two weeks. The court declined to continue the trial, ruling that Garn was unavailable and that his prior testimony was admissible.

Eggleston now argues that the trial court should have required independent medical corroboration that Garn was unavailable to testify.

Under ER 804 a court may admit former testimony when the declarant is "[i]s unable to be present or to testify at the hearing because of ... then existing physical or mental illness or infirmity." [Fn. "Because Garn was subject to cross-examination, admission of his prior testimony does not run afoul of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004)."]. ER 804(a)(4), (b)(1); *State v. Whisler*, 61 Wash.App. 126, 131–32, 810 P.2d 540 (1991). If the witness is unavailable because of illness or infirmity, the illness or infirmity must render the witness' attendance relatively impossible and not merely inconvenient. *Whisler*, 61 Wash.App. at 132, 810 P.2d 540 (citing *People v. Stritzinger*, 34 Cal.3d 505, 194 Cal.Rptr. 431, 668 P.2d 738, 746 (Cal.1983)[)]. The court has a measure of discretion in determining whether the declarant's infirmity is sufficient to justify a finding of unavailability. 5D Karl Tegland, Courtroom Handbook on Evidence, Rule 804, at 424 (2005).

In *Whisler*, where the 94–year–old forgery victim had a heart condition, the trial court allowed the State to read her deposition testimony instead of forcing her to testify in person. *Whisler*, 61 Wash.App. at 131, 810 P.2d 540. When Whisler complained on appeal that no competent expert had testified about the victim's physical condition, Division One found adequate proof in an affidavit summarizing a conversation her doctor had with the prosecuting attorney, coupled with her daughter's testimony about her mother's medical condition. *Whisler*, 61 Wash.App. at 138–39, 810 P.2d 540. The court rejected Whisler's complaint that the daughter's testimony was incompetent because she was not a medical expert: "[She] was certainly competent to testify about facts of her mother's condition that do not require medical expertise to ascertain." *Whisler*, 61 Wash.App. at 140, 810 P.2d 540; *see also Alcala v. Woodford*, 334 F.3d 862, 880 (9th Cir. 2003) (expert medical testimony not essential to establish the existence of a mental infirmity and thus witness unavailability).

Here, the State produced a note from Garn's doctor and Garn's wife testified about his neck surgery, ongoing pain, and his "acting out" as the result of trauma. Additionally, Garn testified that he could not remember much of his investigation, was unable to recognize or review his reports, was experiencing pain, and was taking six medications. In light of this foundation, the trial court did not abuse its discretion in finding him unavailable to testify and in admitting his former testimony under ER 804.

Dkt. 27, Ex. 4, pp. 42-45; *Eggleston*, 129 Wash. App. at 438.

The state court record shows Mr. Garn testified and was cross-examined at Petitioner's first and second trials. Prior to Petitioner's third trial, Mr. Garn was in a car accident which caused serious injury to his neck and back. *See* Dkt. 32, Ex. 68, p. 1228. At a pre-trial hearing to determine if Mr. Garn was available to testify at Petitioner's third trial, Mr. Garn testified he

1    stopped working for the Tacoma Police Department in 2001 following an on-duty accident that

2    required two neck surgeries. *Id*. Mr. Garn explained that he has lost a lot of memory from the

3    past and he has flashbacks from Vietnam. *Id*. at p. 1229. He was preparing for a two-week in-

4    patient stay at the Veterans Affairs ("VA") Hospital for post-traumatic stress disorder ("PTSD")

5    treatment. *Id*. Mr. Garn stated he was in a lot of pain in his neck and left side; he also had some

6    severe tremors from the accident. *Id*. at p. 1230. Mr. Garn testified that he had been struggling

7    with PTSD for thirty years, but his PTSD became more severe following the car accident and his

8    surgeries. *Id*. at pp. 1230, 1238. Looking at crime scene photographs, and even the news, causes

9    Mr. Garn flashbacks. *Id*. at p. 1231. Mr. Garn was unable to comprehend and remember anything

10   he read. *Id*. at p. 1232. He also testified that he was taking several medications. *See id*. at pp.

11   1234-35.

12       Mr. Garn's wife, Rachel Ruth Garn, who was a registered nurse for twenty years, also

13   testified at the pre-trial hearing. *See* Dkt. 32, Ex. 68, pp. 1242-48. Mrs. Garn testified that Mr.

14   Garn becomes violent, extremely depressed, and hallucinates when he watches something

15   containing violence on television. *Id*. at p. 1243. She explained that Mr. Garn cannot remember

16   well and has been instructed by his counselors to avoid the news, war movies, and crime dramas

17   because he will have an episode. *Id*. at p. 1244. Mrs. Garn stated Mr. Garn's pain is nine and a

18   half out of ten and he takes medications for pain and sleeping. *Id*. at p. 1247. The State also

19   produced a letter from Mr. Garn's doctor, which said Mr. Garn could not physically be expected

20   to testify at trial due to his neck condition. *Id*. at p. 1353.

21       In light of the evidence, the trial court found Mr. Garn was unavailable. Dkt. 32, Ex. 68,

22   pp. 1369-71. The trial court found Mr. Garn avoided reading reports because it could trigger a

23   reaction. *Id*. at p. 1370. The trial court was also "somewhat taken aback" by the number and

24

1  scope of drugs Mr. Garn was currently taking. *Id*. The trial court determined Mr. Garn could not

2  recall Petitioner's case. *Id*. at pp. 1370-71. For these reasons, the trial court ruled that Mr. Garn

3  was unavailable to testify. *Id*. at p. 1371.

4      Petitioner asserts the trial court's finding that Mr. Garn was unavailable is unreasonable

5  because the decision regarding whether a witness is unavailable due to the psychological state of

6  the witness should be supported by independent medical corroboration. Dkt. 35, pp. 15-18. Here,

7  evidence of Mr. Garn's physical and mental infirmities was submitted to the trial court through

8  Mr. Garn's testimony, Mr. Garn's wife's testimony, and a letter from Mr. Garn's doctor. The

9  trial court did not rely on Mr. Garn's "self-serving" testimony alone. The trial court relied on

10  testimony from both Mr. and Mrs. Garn. While an independent medical examination may have

11  been relevant, Petitioner has not shown it was essential to determining Mr. Garn's unavailability.

12  Therefore, the Court is not persuaded by Petitioner's argument. *See* Fed. R. Evid. 804; *Alcala v.*

13  *Woodford*, 334 F.3d 862, 880 (9th Cir. 2003) (discussing California law in a habeas petition,

14  stating that "[i]n order to establish the existence of a mental infirmity, expert medical testimony,

15  while potentially relevant, is not essential"); *State v. Whisler*, 61 Wash. App. 126, 139 (1991)

16  (finding an affidavit from the State summarizing a conversation with the witness's doctor and

17  testimony from the witness's daughter was sufficient to find a witness was medically unavailable

18  to testify); *United States v. Amaya*, 533 F.2d 188, 191 (5th Cir. 1976) (finding the trial judge did

19  not abuse his discretion in deciding on the evidence in the record that a witness was unavailable

20  for trial when the witness had memory loss following a vehicular accident prior to re-trial,

21  despite no medical expert testifying regarding the length of time the memory loss would last).

22      The evidence presented to the trial court showed both Mr. Garn's mental and physical

23  infirmities and his inability to remember made him unavailable to testify at Petitioner's trial. The

24

1   state courts' determinations that Mr. Garn was unavailable to testify were, therefore, reasonable.

2   As the state courts' determinations were reasonable and as Petitioner had previously cross-

3   examined Mr. Garn, the Court concludes Petitioner fails to demonstrate the state court's

4   conclusion finding Petitioner's right to confront a witness was not violated when the trial court

5   determined Mr. Garn was unavailable to testify was contrary to, or was an unreasonable

6   application of, clearly established federal law, or was an unreasonable determination of the facts

7   in light of the evidence presented in this case. Accordingly, Ground 4 should be denied.

8         D.  <u>Fair and Impartial Jury (Ground 6)</u>

9         Petitioner asserts, in Ground 6, that his right to a fair and impartial jury was denied

10  because (1) a juror was intimidated by one of the State's witnesses, and (2) a juror was exposed

11  to extraneous information about the trial. Dkt. 6, pp. 30-31.

12        The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel

13  of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "The bias or

14  prejudice of even a single juror would violate [a defendant's] right to a fair trial." *Dyer v.*

15  *Calderon*, 151 F.3d 970, 973 (9th Cir. 1998). "Due process means a jury capable and willing to

16  decide the case solely on the evidence before it, and a trial judge ever watchful to prevent

17  prejudicial occurrences and to determine the effect of such occurrences when they happen."

18  *Smith v. Phillips*, 455 U.S. 209, 217 (1982). To succeed on an impartial juror claim, "a defendant

19  usually bears the burden of demonstrating that the challenged juror was biased[.]" *United States*

20  *v. Mitchell*, 568 F.3d 1147, 1151 (9th Cir. 2009).

21        1.  *Juror Intimidation*

22        First, the state court of appeals found Petitioner was not entitled to relief on his claim of

23  juror intimidation, stating:

24

Eggleston first argues that his right to an impartial jury under the Sixth Amendment of the United States Constitution and under Article I, § 22 of our State Constitution was violated when a police officer witness intimidated a juror by "eyeballing" him during trial. In support of this argument, Eggleston submitted a declaration from Steven Witchley, the attorney representing him in this petition. Witchley's declaration stated:

> [Juror Dean] Lee told me that during the trial, prior to deliberations, one of the police officers who testified at the trial had been staring at Mr. Lee in a way that made him feel uncomfortable. Mr. Lee said the officer remained in the courtroom after he completed his testimony and sat behind the prosecutor in the front row. Mr. Lee used the phrase "eyeballing me" to describe the officer's conduct. When I asked if he could describe the officer, Mr. Lee said that he was a "big dude with blonde hair," that he was a "sergeant detective," and that he was one of the first witnesses to testify at the trial."

Witchley Declaration at 102 (attached to Petition as Exhibit A). Witchley's declaration also indicated that Lee was unwilling to submit his own sworn declaration. Witchley Declaration at 2.

A petitioner seeking post-conviction relief must identify competent admissible evidence in support of his or her petition. In *In re Petition of Rice*, 118 Wn.2d 876, 886 (1992), our Supreme Court described the evidence prerequisite as follows:

> [A] mere statement of evidence that the petitioner *believes* will prove his factual allegations is not sufficient. If the petitioner's allegations are based on matters outside the existing record, the petitioner must demonstrate that he has competent, admissible evidence to establish facts that entitle him to relief. If the petitioner's evidence is based on knowledge in the possession of others, he may not simply state what he thinks those others would say, but must present *their affidavits or other corroborative evidence*. The affidavits, in turn, must contain matter to which the *affiants may competently testify*.

(Some emphasis added). Here, Witchley's statements about what Lee had told him does not constitute competent admissible evidence sufficient to support Eggleston's factual claim that a police officer witness tampered with the jury by "eyeballing" him during trial, because those statements constitute inadmissible hearsay. ER 801, 802. Accordingly, we do not further consider this claim.

Dkt. 27, Ex. 36, pp. 2-3 (footnote omitted).

1    Petitioner asserts the state court denied Petitioner the ability to factually develop this

2    claim. Dkt. 35, pp. 18-22. Essentially, Petitioner is arguing the state's fact-finding process was

3    erroneous. Petitioner contends the state court of appeals' decision was not based on a reasonable

4    determination of the facts under §2254(d)(2) and is, therefore, subject to de novo review by this

5    Court. *See id.*

6    "Because a federal court may not independently review the merits of a state court

7    decision without first applying the AEDPA standards, a federal court may not grant an

8    evidentiary hearing without first determining whether the state court's decision was an

9    unreasonable determination of the facts." *Earp v. Ornoski*, 431 F.3d 1158, 1166–67 (9th Cir.

10   2005). "Where a habeas petitioner has not failed to develop the factual basis of his claim in state

11   court as required by 28 U.S.C. §2254(e)(2), an evidentiary hearing is required if (1) the petitioner

12   has shown his entitlement to an evidentiary hearing pursuant to *Townsend v. Sain,* 372 U.S. 293,

13   313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963),[7] and (2) the allegations, if true, would entitle him to

14   relief." *Hurles v. Ryan*, 752 F.3d 768, 791 (9th Cir. 2014) (citing *Stanley v. Schriro*, 598 F.3d

15   612, 624 (9th Cir. 2010)).

16   The Ninth Circuit has held the relevant Supreme Court cases "do not stand for the

17   proposition that *any time* evidence of juror bias comes to light, due process requires the trial

18   court to question the jurors alleged to have bias." *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th

19   Cir. 2003) (emphasis in original). "Rather, in determining whether a hearing must be held, the

20

21   [7] In *Townsend*, the Supreme Court stated a petitioner is entitled to an evidentiary hearing, if he establishes:
(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual
determination is not fairly supported by the record as a whole; (3) the fact-finding procedure
employed by the state court was not adequate to afford a full and fair hearing; (4) there is a
substantial allegation of newly discovered evidence; (5) the material facts were not adequately
developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did
not afford the habeas applicant a full and fair hearing.

24   *Earp*, 431 F.3d at 1167 (quoting *Townsend*, 372 U.S. at 313).

1  court must consider the content of the allegations, the seriousness of the alleged misconduct or

2  bias, and the credibility of the source." *Id*. (internal quotation marks omitted).

3      Here, Petitioner argues the state court's fact finding procedures were not adequate. *See*

4  Dkt. 35, pp. 18-19. This Court has reviewed the declaration of Petitioner's PRP counsel, Steven

5  Witchley, and finds Petitioner has not shown the state court's decision was an unreasonable

6  determination of the facts or that, if the allegations in the declaration were true, he would be

7  entitled to relief.

8      First, the state court of appeals analyzed the evidence presented by Petitioner regarding

9  juror intimidation. The state court of appeals considered the content of Mr. Witchley's

10  declaration and determined the evidence was inadmissible. Ultimately, the state court of appeals

11  found Petitioner had not submitted evidence that was sufficient to warrant further consideration

12  of the juror intimidation allegation. Petitioner has not shown the state court's determination was

13  inadequate or that the state court denied him the ability to submit evidence. Rather, the state

14  court of appeals found Petitioner's evidence did not support a claim of juror intimidation and,

15  therefore, further consideration of the claim was not necessary. Petitioner fails to explain how

16  this decision resulted in an inadequate fact-finding process.

17      Second, even if the allegations in Mr. Witchley's declaration are true, Petitioner has not

18  shown he is entitled to federal relief. The evidence shows, over eight years after his trial,

19  Petitioner presented hearsay evidence in his PRP alleging a juror, Mr. Lee, told Mr. Witchley he

20  was uncomfortable when one of the State's witnesses "eyeballed" him. Dkt. 27, Ex. 26,

21  Attachment A. Mr. Witchley declared that, if Mr. Lee had been willing, he would have secured a

22  sworn declaration from Mr. Lee detailing the police conduct. *Id*. The Court notes, however, that

23  there is no indication Mr. Witchley asked Mr. Lee if he would provide a sworn declaration. *See*

24

1   *id.* Instead, it appears Mr. Lee spoke with Mr. Witchley on August 12, 2011; Mr. Lee said they

2   could speak again later, but did not return Mr. Witchley's calls on August 13 or August 14, 2011.

3   *See id.*

4          The Court finds Petitioner has not shown the jury was biased solely on Mr. Witchley's

5   declaration that Mr. Lee felt "uncomfortable" when he was eyeballed by a State witness. While

6   Mr. Lee informed Mr. Witchley he felt uncomfortable, there is no indication he felt threatened or

7   intimidated by the State witness's behavior. Importantly, there is no evidence the trial outcome

8   changed because Mr. Lee allegedly felt "uncomfortable." Mr. Lee did not tell Mr. Witchley that

9   he was so uncomfortable that he could not fairly and objectively consider the evidence and

10  participate in deliberations. Furthermore, the evidence is speculative. Petitioner speculates that, if

11  Mr. Lee is subpoenaed, he will testify that when he felt uncomfortable he became intimidated

12  and his intimidation resulted in prejudice towards Petitioner. As Petitioner provided no evidence

13  that a juror was intimidated and the intimidation impacted the trial, the Court finds Petitioner has

14  not shown he would be entitled to federal relief if the allegations in the declaration were true.

15  Therefore, he has not shown the state court of appeals' decision was an unreasonable

16  determination of the facts and this ground is subject to a de novo review.

17         To the extent Petitioner is arguing an evidentiary hearing is warranted under §

18  2254(e)(2), this argument also fails. Section 2254(e)(2), the provision which controls whether a

19  petitioner may receive an evidentiary hearing in federal court on a claim not developed in the

20  state court, provides:

21         If the applicant has failed to develop the factual basis of a claim in State court
           proceedings, the court shall not hold an evidentiary hearing on the claim unless
22         the applicant shows that—
           (A) the claim relies on—
23             (i) a new rule of constitutional law, made retroactive to cases on collateral
               review by the Supreme Court, that was previously unavailable; or
24

1          (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

2 (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder

3     would have found the applicant guilty of the underlying offense.

4 28 U.S.C. § 2254(e)(2); *see also Williams*, 529 U.S. at 429–30. Petitioner provides no argument

5 showing he is entitled to an evidentiary hearing under § 2254(e)(2). *See* Dkt. 35, pp. 18-22.

6 Petitioner does not contend, nor does the Court find, Petitioner's juror intimidation claim relies

7 on a new rule of constitutional law that was previously unavailable or a factual predicate that

8 could not have been previously discovered. *See id*. Further, as the Court has found, the facts and

9 evidence underlying Petitioner's juror intimidation claim are not sufficient "to establish by clear

10 and convincing evidence that but for constitutional error, no reasonable factfinder would have

11 found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

12        For the above stated reasons, Petitioner has not shown the state court's finding that

13 Petitioner failed to show his right to an impartial jury was violated because a juror was

14 intimidated was contrary to, or an unreasonable application of, clearly established federal law, or

15 was an unreasonable determination of the facts. Therefore, he is not entitled to an evidentiary

16 hearing and de novo review of the juror intimidation claim. *See Pha v. Swarthout*, 568 Fed.

17 App'x. 849, 850 (9th Cir. 2016) (finding clearly established law required the state court to go no

18 further after considering the content of the allegations of juror misconduct, the seriousness of the

19 alleged misconduct or bias, and the credibility of the source); *Rose v. Santoro*, 2015 WL

20 8665968, at *9 (E.D. Cal. Dec. 14, 2015) (finding the petitioner failed to "show juror bias based

21 on the hearsay allegations that Presiding Juror failed to disclose that she was the victim of a

22 sexual assault").

23

24

2.  *Extrinsic Evidence*

Second, the state court of appeals determined Petitioner's right to an impartial jury under the Sixth Amendment was not violated when a juror brought a newspaper into the jury room, stating:

> Next, Eggleston argues that his right to an impartial jury under the Sixth Amendment of the United States Constitution and under Article I, § 22 of our State Constitution was violated when a juror brought extrinsic evidence into the jury room. Eggleston presents support for this claim through the declaration of juror Nickol Cheslik. Cheslik's declaration states in relevant part:
>
> > While we were on the jury we were forbidden to watch the news or to read newspaper accounts of the trial. However, during the trial, but before deliberations, one of the jurors brought a newspaper into the jury room. The newspaper contained coverage of the trial. I do not recall which juror brought the newspaper, but I believe it was a woman. The newspaper was removed from the jury room after the other jurors chastised the juror who had brought it into the jury room.
>
> Cheslik Declaration at 1 (attached to Petition as Exhibit B).
>
> It is "misconduct for a jury to consider extrinsic evidence and if it does, that may be a basis for a new trial." *State v. Pete*, 152 Wn.2d 546, 552 (2004). To be entitled to a new trial based on jury misconduct, the misconduct must have prejudiced the defendant. *State v. Depaz*, 165 Wn.2d 842, 856 (2009).
>
> Eggleston concedes that he cannot succeed on his jury misconduct claim without further factual development and requests this court to order a reference hearing. Petition at 10. We decline to order a reference hearing because Cheslik's declaration does not allege that any juror had viewed or considered the newspaper that a juror had brought into the jury room. Rather, Cheslik's declaration suggests that the jury members did not view or consider the newspaper, as she states that the newspaper was removed from the jury room after the other jurors chastised the juror who brought it in to the jury room. Cheslik Declaration at 1. Under *Rice*, Cheslik's declaration does not provide a sufficient basis in which to order a reference hearing because the declaration does not contain facts necessary to entitle Eggleston to relief. 118 Wn.2d at 886. Accordingly, we do not further consider this claim.

Dkt. 27, Ex. 36, pp. 3-4.

1   Due process requires a criminal defendant to be tried by "a jury capable and willing to

2   decide the case solely on the evidence before it." *Smith*, 455 U.S. at 217; *Estrada v. Scribner*,

3   512 F.3d 1227, 1238 (9th Cir. 2008); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986)

4   ("Jurors have a duty to consider only the evidence which is presented to them in open court.").

5   The introduction of prejudicial extraneous influences into the jury room constitutes misconduct

6   which may result in the reversal of a conviction. *See Parker v. Gladden*, 385 U.S. 363, 364-65

7   (1966). However, relief under § 2254 is warranted only where it is reasonably likely the

8   petitioner would have obtained a better outcome if the misconduct had not occurred. *See Brecht*

9   *v. Abrahamson*, 507 U.S. 619, 637 (1993) (constitutional trial errors do not warrant habeas relief

10  unless they have substantial and injurious impact or influence on the jury's verdict).

11      The following factors are relevant to determining whether the alleged introduction of

12  extrinsic evidence constitutes reversible error: (1) whether the extrinsic material was actually

13  received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which

14  the jury discussed and considered it; (4) whether the material was introduced before a verdict

15  was reached, and if so, at what point in the deliberations it was introduced; and (5) any other

16  matters which may bear on the issue of whether the introduction of extrinsic material

17  substantially and injuriously affected the verdict. *Estrada*, 512 F.3d at 1238; *see also Sassounian*

18  *v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000).

19      Petitioner again does not argue the merits of this claim, but appears to argue the state

20  court of appeals' decision on this claim was also an unreasonable determination of the facts

21  because the state court did not hold an evidentiary hearing. *See* Dkt. 35, pp. 18-22 (argument

22  focused on the juror intimidation assertions). As above, Petitioner requests this Court hold an

23  evidentiary hearing on both his claims of jury bias/misconduct. The Court notes Petitioner states

24

1    the evidence showing juror intimidation requires the Court to hold a hearing; he does not

2    expressly provide any argument regarding the claim that the introduction of extrinsic evidence

3    resulted in jury misconduct. *Id.*

4          Here, the state court of appeals concluded the evidence submitted by Petitioner did not

5    show any juror viewed or considered the newspaper and found the evidence, in fact, suggested

6    the jurors did not view or consider the newspaper because the jurors removed the newspaper

7    from the jury room. The Court has reviewed the evidence – the declaration of Nickol Cheslik –

8    and finds the state court's decision was not an unreasonable determination of the facts. The

9    evidence shows a juror brought a newspaper that contained coverage of the trial into the jury

10   room prior to deliberations. Dkt. 27, Ex. 26, Attachment B. "The newspaper was removed from

11   the jury room after other jurors chastised the juror who had brought it into the jury room." *Id.*

12         In considering the factors detailed above, the Court finds the following: first, there is no

13   evidence any juror actually read the newspaper coverage of the trial and, therefore, there is no

14   evidence the extrinsic material was actually received by the jury. Second, the evidence indicates

15   the newspaper was available to the jury for a short amount of time because the other jurors

16   chastised the juror who brought the newspaper to the jury room and it was removed. Third, there

17   is no evidence the jury discussed and considered the newspaper article regarding the trial. Fourth,

18   the newspaper was introduced to the jury prior to deliberations. Fifth, there is no evidence

19   showing the brief introduction of a newspaper that contained coverage of Petitioner's trial was

20   read or impacted the jury deliberations or verdict.

21         Petitioner has not shown the state court's finding that Petitioner failed to show his right to

22   an impartial jury was violated because a juror brought a newspaper into the jury room was

23   contrary to, or an unreasonable application of, clearly established federal law, or was an

24

1    unreasonable determination of the facts. *See United States v. Caro-Quintero*, 769 F. Supp. 1564,

2    1575 (C.D. Cal. 1991) (finding the jury was not exposed to extrinsic evidence because

3    newspapers were in the jury room and stating, "[t]he mere fact that local newspapers were in the

4    jury room does not amount to extraneous influences on the jury").

5            3.   *Conclusion*

6        For the above stated reasons, the Court finds Petitioner has not shown the state court's

7    decision related to the evidence submitted in support of Ground 6 was an unreasonable

8    determination of the facts. Further, Petitioner has not shown he is entitled to an evidentiary

9    hearing on his jury bias/misconduct claims. The Court finds Petitioner has not shown the state

10   court's finding as to the jury misconduct claims was contrary to, or an unreasonable application

11   of, clearly established federal law, or was an unreasonable determination of the facts.

12   Accordingly, Ground 6 should be denied.

13                                EVIDENTIARY HEARING

14       The decision to hold an evidentiary hearing is committed to the Court's discretion.

15   *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "[A] federal court must consider whether such a

16   hearing could enable an applicant to prove the petition's factual allegations, which, if true, would

17   entitle the applicant to federal habeas relief." *Id.* at 474. In determining whether relief is

18   available under 28 U.S.C. § 2254(d)(1), the Court's review is limited to the record before the

19   state court. *Cullen*, 563 U.S. at 181-82. A hearing is not required if the allegations would not

20   entitle Petitioner to relief under §2254(d). *Landrigan*, 550 U.S. at 474. "It follows that if the

21   record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district

22   court is not required to hold an evidentiary hearing." *Id*. The Court finds it is not necessary to

23

24

1  hold an evidentiary hearing in this case because, as discussed in this Report and

2  Recommendation, Petitioner's grounds may be resolved on the existing state court record.

3  <u>CERTIFICATE OF APPEALABILITY</u>

4      A petitioner seeking post-conviction relief under 28 U.S.C. § 2254 may appeal a district

5  court's dismissal of the federal habeas petition only after obtaining a certificate of appealability

6  (COA) from a district or circuit judge. *See* 28 U.S.C. § 2253(c). "A certificate of appealability

7  may issue . . . only if the [petitioner] has made a substantial showing of the denial of a

8  constitutional right." 28 U.S.C. § 2253(c)(2). Petitioner satisfies this standard "by demonstrating

9  that jurists of reason could disagree with the district court's resolution of his constitutional

10  claims or that jurists could conclude the issues presented are adequate to deserve encouragement

11  to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*,

12  529 U.S. 473, 484 (2000)).

13      No jurist of reason could disagree with this Court's evaluation of Petitioner's claims or

14  would conclude the issues presented in the Amended Petition should proceed further. Therefore,

15  the Court concludes Petitioner is not entitled to a certificate of appealability with respect to this

16  Amended Petition.

17  <u>CONCLUSION</u>

18      For the above stated reasons, the Court finds Grounds 3, 5, and 7 should be dismissed and

19  Grounds 1, 2, 4, and 6 should be denied. No evidentiary hearing is necessary. Therefore, the

20  Court recommends the Amended Petition be denied and a certificate of appealability be denied.

21      Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

22  fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

23  6. Failure to file objections will result in a waiver of those objections for purposes of de novo

24

1   review by the district judge. *See* 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit

2   imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

3   September 14, 2018 as noted in the caption.

4         Dated this 24th day of August, 2018.

5

6

7                                            David W. Christel
                                             United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24